767 F.2d 1456
 54 USLW 2130
 Elizabeth SUDOMIR, Ebrahim Nejati, Mahin Vojdani Nejati,
Mojgan Nejati, a minor, by her guardian ad litem, Ebrahim
Nejati, Veronica Jefferson, a minor, by her guardian ad
litem, Elizabeth Sudomir, on Behalf of themselves and all
others similarly situated, Plaintiffs-Appellants,
v.
Linda McMAHON, in her official capacity as the Executive
Director of the Department of Social Services of the State
of California; Jesse Huff, in his official capacity as
Director of the Department of Finance of the State of
California; and Margaret M. Heckler, in her official
capacity as Secretary of the Department of Health and Human
Services of the United States of America, Defendants-Appellees.
 No. 84-2077.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 13, 1985.
Decided Aug. 12, 1985.
 
 Joseph E. Rasch-Chabot, Feldman, Waldman & Kline, San Francisco, Cal., for plaintiffs-appellants.
 William F. Soo Hoo, Dist. Atty. Gen., Sacramento, Cal., Deborah Ruth Kant, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the Eastern District of California.
 Before SNEED, TANG and CANBY, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 This is an appeal from the denial of a motion for a preliminary injunction by three aliens who challenge the denial by the California Department of Social Services (the Department) of welfare benefits under the Aid to Families with Dependent Children (AFDC) program. Each of the three has applied for, but not yet received, political asylum. In essence, the aliens contend that the pertinent legislation and the Equal Protection Clause of the Fourteenth Amendment entitle them to receive AFDC benefits. We affirm.[1]
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 2
 The AFDC program is a cooperative federal-state effort established by Congress to furnish financial assistance to certain needy families with dependent children. See 42 U.S.C. Secs. 601-615 (1982). The program provides benefits to needy children when at least one parent is absent or is physically or mentally incapacitated or, in the state's discretion, when one parent is unemployed. To qualify as either a dependent child, a caretaker relative, or any other person whose needs are considered in determining AFDC eligibility, 42 U.S.C. Sec. 602(a)(33) (1982), requires that the states provide that
 
 
 3
 such individual must be either (A) a citizen, or (B) an alien lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law (including any alien who is lawfully present in the United States as a result of the application of the provisions of section 1157(c) of title 8 (or of section 1153(a)(7) of title 8 prior to April 1, 1980), or as a result of the application of the provisions of section 1158 or 1182(d)(5) of title 8 )....
 
 
 4
 42 U.S.C. Sec. 602(a)(33) (1982) (emphasis added).
 
 
 5
 Elizabeth Sudomir, Ebrahim Nejati, and Mahin Vojdani, aliens who have applied for asylum in the United States, each unsuccessfully sought AFDC benefits under the above section. Sudomir, after escaping from Poland in May 1981 to avoid persecution as a member of the Solidarity Labor Union, entered the United States without undergoing an inspection by an immigration officer, in violation of 8 U.S.C. Sec. 1251(a)(2) (1982). She applied for asylum, and the Immigration and Naturalization Service (INS) stayed the institution of deportation proceedings pending the disposition of her application. Her application for AFDC benefits was rejected in part by the Department because of her status as an asylum applicant. That is, the Department ignored Sudomir's own needs in calculating her family's monthly AFDC grant. Also, the INS has not granted her authorization to work.
 
 
 6
 Nejati and Vojdani overstayed the terms of their nonimmigrant visas and are deportable under 8 U.S.C. Sec. 1251(a)(9) (1982). They applied for asylum to escape persecution in Iran. Again, the INS has stayed deportation proceedings pending the outcome of the asylum application process. Nejati and Vojdani applied for AFDC and Medi-Cal benefits, which the Department denied under section 602(a)(33) because of their status as asylum applicants. As in Sudomir's case, the INS has not yet granted authorization to work.
 
 
 7
 On January 9, 1984, the appellants brought a class action against the State of California seeking declaratory relief and a preliminary injunction preventing the Department from denying AFDC eligibility to asylum applicants. The state responded by filing a third party complaint against the Secretary which sought to bind the Secretary to any judgment against the state. The appellants then amended their complaint, adding the Secretary as a defendant. At the time they filed their initial complaint, the appellants also moved for a preliminary injunction, which the district court denied in an order entered on May 23, 1984. This appeal followed.[2]
 
 II.
 STANDARD OF REVIEW
 
 8
 Granting or denying a preliminary injunction lies within the discretion of the district court. Sports Form, Inc. v. United Press International, 686 F.2d 750, 752 (9th Cir.1982). Accordingly, our review is a limited one. The district court's decision must be affirmed unless the court relied on an erroneous legal premise, on a clearly erroneous finding of fact, or on a misapplication of the law to the facts of the case. Lynch v. Rank, 747 F.2d 528, 534 (9th Cir.1984); Sports Form, Inc., 686 F.2d at 752. The issue here is whether the district court misapprehended the law governing the case.[3]
 
 III.
 SECTION 602(a)(33)
 
 9
 A. The Issue: Is the Secretary's Interpretation Permissible?
 
 
 10
 The Secretary offers an interpretation of section 602(a)(33) which excludes asylum applicants from AFDC eligibility. An agency's interpretation of a statute it administers is entitled to considerable deference. Hawaiian Electric Co. v. United States Environmental Protection Agency, 723 F.2d 1440, 1447 (9th Cir.1984); accord Worthington v. Icicle Seafoods, Inc., 749 F.2d 1409, 1412 (9th Cir.1984). "Properly accorded, such deference entails affirmance of any interpretation 'within the range of reasonable meanings the words permit,' comporting with the statute's clear purpose." Alcaraz v. Block, 746 F.2d 593, 606 (9th Cir.1984).
 
 
 11
 Under these circumstances, the question we face is whether the Secretary's denial of AFDC benefits to asylum applicants rests on a permissible construction of the statute. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, --- U.S. ----, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). We cannot reject a reasonable interpretation merely because, had we considered the statute initially, we would have preferred another. Id., 104 S.Ct. at 2782 n. 11; Kunaknana v. Clark, 742 F.2d 1145, 1150 (9th Cir.1984); National Treasury Employees Union v. FLRA, 732 F.2d 703, 706 (9th Cir.1984).
 
 
 12
 B. The Statute and Its Sources.
 
 
 13
 Although section 602(a)(33) confers eligibility upon aliens "permanently residing in the United States under color of law,"[4] Congress has provided little help in fixing the content of this clause. It is true that the statute does contain four examples of groups of aliens who satisfy the requirement. One such group consists of aliens "lawfully present in the United States as a result of the application of the provisions of ... [8 U.S.C.] Sec. 1158...." Section 1158, in turn, requires that the Attorney General establish a procedure by which aliens already present in the United States or at a border or a port of entry may apply for asylum and vests the Attorney General with discretion to grant asylum to aliens that are determined to be "refugees," as defined elsewhere in Title 8. See 8 U.S.C. Sec. 1101(a)(42) (1982) (defining refugee).
 
 
 14
 Section 1158 plainly envisions the creation of an asylum process, of which the application for asylum is a part. The aliens argue, therefore, that those who apply are "lawfully present ... as a result of the application of the provisions of section 1158." It appears that Congress borrowed the section 602(a)(33) language from a regulation promulgated earlier by the Secretary. See 45 C.F.R. Sec. 233.50 (1978). That regulation provided that aliens "permanently residing in the United States under color of law" include aliens "lawfully present in the United States as a result of the application of the provision of section 203(a)(7) [8 U.S.C. Sec. 1153(a)(7) ] or section 212(d)(5) [8 U.S.C. Sec. 1182(d)(5) ] of the Immigration and Nationality Act." Sections 203(a)(7) and 212(d)(5), in turn, gave the Attorney General discretion to admit aliens as conditional entrants or as temporary parolees.
 
 
 15
 Neither statute, however, made any provision for an application procedure. Conditional entrants or temporary parolees had been granted entry. Having been granted entry, they were "lawfully present in the United States as a result of the application of" those statutes. It stretches this language considerably to have it embrace an alien illegally present in the United States who has merely applied for asylum. The most that can be said is that Congress, in employing the language of 45 C.F.R. Sec. 233.50, did not clearly consider the eligibility of asylum applicants.
 
 
 16
 C. The Secretary's Position.
 
 
 17
 The Secretary contends that "permanently residing ... under color of law" rests on two factors: first, an official determination by the INS that an alien is legitimately present in the country and, second, a determination that the alien is legitimately present for an indefinite period of time. These factors, the Secretary maintains, are the common threads running through the categories of aliens enumerated in section 602(a)(33).[5] Similarly, the Secretary views aliens granted indefinite stays of deportation, see 8 C.F.R. Sec. 243.4 (1985), or extensions of voluntary departure, see id. Secs. 242.5(a)(2)-(3), 244.2, as eligible for AFDC benefits. Aliens in each class have been subject to an official review and are entitled to reside in the United States for an indefinite period.
 
 
 18
 Asylum applicants, by contrast, have received no official sanctioning of their presence and no official determination that they may remain in the country indefinitely. Their status and its duration are inchoate. An application triggers an administrative process that culminates either in the award of political asylum or in the institution of deportation or voluntary departure proceedings. It does not, the Secretary concludes, confer any status or right to reside in the United States permanently.[6]
 
 
 19
 D. The Appellants' Position.
 
 
 20
 The appellants counter by asserting that residence in the United States "under color of law" requires only that an alien remain with the knowledge and permission of the INS. Under these circumstances the inchoateness of the alien's status and its duration are irrelevant. The requirement that such alien must reside "permanently" means only that the INS has no present intent to enforce departure.
 
 
 21
 The appellants rely on Holley v. Lavine, 553 F.2d 845 (2d Cir.1977), cert. denied, 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978). In that case, an alien sought AFDC benefits for herself and for her six dependent children, who were United States citizens. Although she resided in the United States illegally, the alien possessed an official letter from the INS stating that, for humanitarian reasons, the agency did not contemplate enforcing her departure at that time. The question raised was whether the alien was "permanently residing in the United States under color of law" as required by 45 C.F.R. Sec. 233.50.[7] The Second Circuit decided that she was.
 
 
 22
 The Court said the alien did not "resid[e] in the United States without the knowledge or permission of the [INS]." Id. at 849. Her stay, the court continued, was sanctioned by the discretionary refusal of the INS to use its enforcement powers and was therefore "under color of law." Id. at 849-850. Moreover, the letter constituted an official assurance that the INS would not commence deportation proceedings at least until the alien's minor children no longer depended on her. Id. at 849. Thus, her status and its duration were fixed. Her residence was therefore permanent.
 
 
 23
 The aliens here insist that they, like the plaintiff in Holley, reside in the United States with the knowledge and permission of the INS.[8] As applicants, they have been informed that they may remain in the United States until a final decision is reached or until the INS decides otherwise. See INS Form I-589 p 4 (Request for Asylum in the United States). And the INS generally does not commence departure proceedings until after an application is denied. Cf. 8 C.F.R. Sec. 208.8(f)(4) (1985) (giving the district director discretion to grant voluntary departure or to commence deportation proceedings upon the denial of the applicant's request for asylum).
 
 
 24
 E. This Court's Position.
 
 
 25
 The issue is a close one. However, we are persuaded that the Secretary's construction of the statute is a permissible one. The status of asylum applicants and its duration can hardly be described as fixed, or permanent. To repeat, they are best described as inchoate. Asylum applicants, therefore, reside in the United States "under color of law," but their residence is not considered by the Secretary to be "permanent." The immigration laws provide a statutory definition of the term "permanent" which supports the Secretary. It means
 
 
 26
 a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law.
 
 
 27
 8 U.S.C. Sec. 1101(a)(31) (1982).
 
 
 28
 Although this section establishes that "permanently" does not mean "forever," see Holley, 553 F.2d at 851, it also establishes that it does not embrace transitory, inchoate, or temporary relationships. A residence may be "permanent" where the INS has permitted an alien to stay in the United States "so long as he is in a particular condition," id., even though circumstances may change, and the alien may later lose his right to stay. A residence is temporary when the alien's continued presence is solely dependent upon the possibility of having his application for asylum acted upon favorably. Aliens who have official authorization to remain indefinitely until their status changes reside permanently;[9] asylum applicants who merely participate in a process that gives rise to the possibility of such an authorization reside temporarily. This is, to repeat, a permissible construction of the statute.
 
 
 29
 It is not true that aliens present in the United States, who have applied for asylum under current immigration provisions, are indistinguishable from aliens granted temporary parole under the law as it stood before the passage of the Refugee Act of 1980, Pub.L. No. 96-212, 1980 U.S.Code Cong. & Ad.News (94 Stat.) 102. Prior to the enactment of the Refugee Act, the Attorney General, exercising broad discretion under 8 U.S.C. Sec. 1182(d)(5), routinely paroled large groups of aliens into the United States pending determination of their admissibility. Aliens so paroled included applicants for asylum. See United States v. Kavazanjian, 623 F.2d 730, 735 n. 8 (1st Cir.1980). Pre-Refugee Act temporary parolees received benefits under various welfare programs as aliens "permanently residing in the United States under color of law." See, e.g., 42 U.S.C. Sec. 1382c(a)(1)(B) (temporary parolees are eligible for SSI benefits). The applicants in this case are not temporary parolees, however.
 
 
 30
 Although section 602(a)(33) explicitly provides that temporary parolees are eligible for AFDC benefits, the present discretion of the Attorney General to parole aliens into the United States is quite limited. The Refugee Act in large part replaced the use of parole with the section 1157 refugee provision and the section 1158 asylum application procedure. Under section 1158, aliens already present in the United States, as well as aliens who present themselves at a land border or a port of entry can request asylum. Applicants at the border generally are required to "await decision in the foreign contiguous territory from which they came unless it can be shown that such requirement should be waived for humanitarian reasons, to unify a family, or when it is otherwise in the public interest." INS Operations Instructions Sec. 208.7, reprinted in 4 C. Gordon & H. Rosenfield, Immigration Law and Procedure 23-156.15 (rev. ed. 1985).
 
 
 31
 Had such applicants been allowed to enter the United States while the INS considered their applications, their situation would have been similar to that of temporary parolees.[10] The appellants did not do this. They either entered or remained in the United States illegally and then applied for asylum. Their presence is tolerated during the period necessary to process their applications; it has not been legitimated by any affirmative act. Such legitimation does occur when temporary parole is granted.
 
 
 32
 This distinction is consistent with the intent of Congress as reflected in its enactment of the Refugee Act. Congress intended to "end[ ] the ... ad hoc use of the parole authority, which ha[d] been implemented by custom rather than clearly defined by law." S.Rep. No. 256, 96th Cong., 2d Sess. 5, reprinted in 1980 U.S.Code Cong. & Ad.News 141, 145. Accordingly, the Act "eliminate[d] the piecemeal approach to the admission of refugees previously existing under Sec. 203(a)(7) and Sec. 212(d)(5) of the Immigration and Nationality Act, [8 U.S.C. Secs. 1153(a)(7), 1182(d)(5),] and Sec. 108 of the regulations, and ... establish[ed] a systematic scheme for admission and resettlement of refugees." INS v. Stevic, --- U.S. ----, 104 S.Ct. 2489, 2498-99, 81 L.Ed.2d 321 (1984). Under the new scheme, temporary parole is unavailable absent an individualized determination that "compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157...." 8 U.S.C. Sec. 1182(d)(5)(B). As already pointed out, the INS generally requires aliens who apply for asylum at a border or a port of entry to remain outside the United States until their applications are granted. See INS Operations Instructions Sec. 208.7, supra. The plaintiffs interpretation of section 602(a)(33) would seriously undermine this new scheme.
 
 
 33
 Nor do we find that the Secretary's interpretation of section 602(a)(33) is inconsistent with the administration of other welfare programs. Congress has used the operative language of 42 U.S.C. Sec. 602(a)(33) as a test for eligibility under a variety of federal programs in addition to AFDC. These include establishing entitlement to SSI benefits, see 42 U.S.C. Sec. 1382c(a)(1)(B) (1982), and to unemployment compensation, see 26 U.S.C. Sec. 3304(a)(14)(A) (1982).[11] As originally passed by the House of Representatives, the SSI bill limited eligibility to aliens who were "lawfully admitted for permanent residence." H.R.Rep. No. 231, 92d Cong., 2d Sess., reprinted in, 1972 U.S.Code Cong. & Ad.News 4989, 5322. The full Senate added two amendments, one extending coverage to aliens who were "otherwise permanently residing in the United States under color of law" and another clarifying that the new phrase covered political refugees admitted into the United States as either conditional entrants or temporary parolees. See 118 Cong.Rec. 33,959 (1972). The appellants maintain that by these amendments Congress adopted the principle that the federal government should bear responsibility for providing subsistence benefits to needy aliens whether invited into the country or not. We disagree.
 
 
 34
 All the Senate amendments did was clarify that aliens allowed into the United States under the then-existing provisions for the admittance of refugees were eligible for welfare. The appellants, as pointed out above, occupy a different position. The SSI history therefore lends no support to their claims.
 
 
 35
 The eligibility standards for federal unemployment compensation similarly fail to advance the appellants' cause. Aliens may become eligible for unemployment benefits, provided that "compensation shall not be payable on the basis of services performed by an alien unless such alien ... was lawfully present for purposes of performing such services, or was permanently residing in the United States under color of law at the time such services were performed...." 26 U.S.C. Sec. 3304(a)(14)(A) (1982).
 
 
 36
 The appellants focus on the language in section 3304(a)(14)(A) allowing benefits to aliens "lawfully present for performing such services." Because an asylum applicant may be granted work authorization, see 8 C.F.R. Sec. 208.4 (1985), such an applicant, the plaintiffs insist, is "lawfully present for purposes of performing such services." The legislative history indicates that Congress intended to extend benefits to nonresident aliens who are lawfully present to work in the United States for temporary periods while excluding illegal aliens from coverage. See S.Rep. No. 67, 95th Cong., 1st Sess. 14-15, reprinted in, 1977 U.S.Code Cong. & Ad.News 79, 91; H.R.Conf.Rep. 158, 95th Cong., 1st Sess. 11, reprinted in, 1977 U.S.Code Cong. & Ad.News 98, 103. No similar concern animated Congress's allocation of AFDC benefits, and as a consequence, no similar language exists in 42 U.S.C. Sec. 602(a)(33).[12]
 
 
 37
 We conclude that the Secretary's assertion that Congress never intended to extend welfare benefits to aliens whose presence in the United States is unlawful and whose sole claim to entitlement rests on their filing applications for asylum with the INS is reasonable and, accordingly, permissible. The district court did not misapprehend the law in concluding that the plaintiffs had failed to demonstrate any success on the merits of their claimed eligibility for AFDC benefits.
 
 IV.
 EQUAL PROTECTION
 
 38
 Even if 42 U.S.C. Sec. 602(a)(33) excludes asylum applicants from eligibility for AFDC benefits, the appellants maintain that the Department's denial of benefits to aliens in the plaintiffs' class is unconstitutional. The district court, finding that the state had merely adopted a federal policy regarding the treatment of asylum applicants, applied the rational basis test and concluded that the challenged classification was valid. The appellants insist that the use of the rational basis test was improper. They maintain that either the strict scrutiny test (state classifications based on alienage, see Bernal v. Fainter, --- U.S. ----, 104 S.Ct. 2312, 2316, 81 L.Ed.2d 175 (1984); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971)), or the intermediate level of scrutiny (state laws discriminating against illegal aliens, see Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)) should apply. We hold otherwise.
 
 
 39
 Our foundation is that federal authority in the areas of immigration and naturalization is plenary. See Fiallo v. Bell, 430 U.S. 787, 794-96, 97 S.Ct. 1473, 1479-80, 52 L.Ed.2d 50 (1977); Mathews v. Diaz, 426 U.S. 67, 81-82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976); Takahashi v. Fish & Game Commission, 334 U.S. 410, 419, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478 (1948); U.S. Const. art. I, Sec. 8, cl. 4. Judicial review of the decisions made by the political branches is fairly narrow. Mathews, 426 U.S. at 81-82, 96 S.Ct. at 1892; Harisiades v. Shaughnessy, 342 U.S. 580, 588-89, 72 S.Ct. 512, 518-19, 96 L.Ed. 586 (1952). Accordingly, federal classifications based on alienage are subject to relaxed scrutiny. See Nyquist v. Mauclet, 432 U.S. 1, 7 n. 8, 97 S.Ct. 2120, 2124 n. 8, 53 L.Ed.2d 63 (1977); Mow Sun Wong v. Campbell, 626 F.2d 739, 744 n. 10 (9th Cir.1980), cert. denied, 450 U.S. 959, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981). Federal classifications distinguishing among groups of aliens thus are valid unless "wholly irrational." Mathews, 426 U.S. at 83, 96 S.Ct. at 1893. No one contends that the classification at issue here is "wholly irrational."
 
 
 40
 It is true, of course, that states lack similar powers over immigration. Takahashi, 334 U.S. at 419, 68 S.Ct. at 1142. "The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that all persons lawfully in this country shall abide 'in any state' on an equality of legal privileges with all citizens under non-discriminatory laws." Id. at 420, 68 S.Ct. at 1143. To justify a law disadvantaging aliens--like any law discriminating against a "suspect class"--a state must demonstrate "that its classification has been precisely tailored to serve a compelling governmental interest." Plyler v. Doe, 457 U.S. 202, 217, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982); Graham v. Richardson, 403 U.S. 365, 370-76, 91 S.Ct. 1848, 1851-54, 29 L.Ed.2d 534 (1971). And state laws discriminating against illegal aliens must be shown to further at least a substantial interest of the state. Plyler, 457 U.S. at 217-218, 230, 102 S.Ct. at 2395, 2401. The appellants assert that, despite the necessity to make such a showing, the defendants have shown neither here. The defendants respond by asserting that it is not necessary to make such a showing because California has merely adopted a federal classification which is subject only to the rational basis standard of review.
 
 
 41
 The appellants' argue that, while the states are precluded from applying more restrictive eligibility standards than those required by federal law,[13] nothing prevents a state from adopting more liberal eligibility standards "so long as the grant in these cases is derived exclusively from state funding." See Darces v. Woods, 35 Cal.3d 871, 679 P.2d 458, 474, 201 Cal.Rptr. 807, 823 (1984); Ottman v. Fisher, 319 A.2d 56, 62 (Me.1974); see also Engelman v. Amos, 404 U.S. 23, 24, 92 S.Ct. 181, 182, 30 L.Ed.2d 143 (1971) (upholding a state statute authorizing payments directly to vendors who supply goods and services to AFDC beneficiaries against argument that such payments conflicted with federal law). On this foundation they then argue that a state's refusal to adopt more liberal eligibility standards is a matter of state, not federal, policy. This refusal, therefore, must withstand either strict scrutiny or, at least, the intermediate scrutiny applied to state classifications resting on illegal alienage.[14] We disagree. To so hold would amount to compelling the states to adopt each and every more generous classification which, on its face, is not irrational.
 
 
 42
 Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), does not support the appellants' position. There, the Supreme Court invalidated a state law that denied free public education to the children of illegal aliens. The Court's decision rested substantially on the fact that the state had employed the federal classification "for its own discriminatory policy." Id. at 226, 102 S.Ct. at 2399 (emphasis added). The state's practice did not correspond to any identifiable congressional policy respecting education and in fact did not operate harmoniously with the overall federal approach to immigration. Id. at 225-26, 102 S.Ct. at 2399. Had there been an articulable federal policy, the Court makes clear, the situation would have been different:
 
 
 43
 With respect to the actions of the Federal Government, alienage classifications may be intimately related to the conduct of foreign policy, to the federal prerogative to control access to the United States, and to the plenary federal power to determine who has sufficiently manifested his allegiance to become a citizen of the Nation. No State may independently exercise a like power. But if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction.
 
 
 44
 Id. at 219 n. 19, 102 S.Ct. at 2396 n. 19 (emphasis added).[15]
 
 
 45
 In the instant case, the state employed both a federal classification and a uniform federal policy regarding the appropriate treatment of a particular subclass of aliens. Section 602(a)(33), indeed, requires participating states to provide that in order for an individual to qualify as a person whose needs should be taken into account in determining AFDC eligibility, "such individual must be ... [inter alia] an alien ... permanently residing in the United States under color of law...." (emphasis added). Thus, the statute apparently requires states not only to grant benefits to eligible aliens but also to deny benefits to aliens who do not satisfy the section 602(a)(33) test. California has indeed "followed the federal direction." It would make no sense to say that Congress has plenary power in the area of immigration and naturalization and then hold that the Constitution impels the states to refrain from adhering to the federal guidelines. The district court correctly applied the relaxed scrutiny standard to the law in upholding the denial of benefits to asylum applicants. See also Monmouth Medical Center v. Hau Kwok, 183 N.J.Super. 494, 444 A.2d 610 (1982) (upholding state regulation excluding illegal aliens from coverage of joint federal/state Medicaid program, where pertinent federal regulations required such exclusion).
 
 
 46
 We also are unpersuaded that the federal classification, to which the states must adhere, is unconstitutional because it authorizes states to violate the Equal Protection Clause. See Shapiro v. Thompson, 394 U.S. 618, 641, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600 (1969). The Court in Shapiro, while holding invalid a state law conditioning welfare assistance on a one-year residency requirement, suggested in dictum that if Congress had authorized such an unconstitutional state requirement, then Congress's own legislation would be invalid. Id. Here, however, the classification Congress has created is valid because of its plenary power over immigration. Moreover, Congress has enacted a uniform policy regarding the eligibility of asylum applicants for welfare benefits. This makes inapplicable the suggestion in Graham v. Richardson, 403 U.S. 365, 382, 91 S.Ct. 1848, 1857, 29 L.Ed.2d 534 (1971), that Shapiro may require the invalidation of congressional enactments permitting states to adopt divergent laws regarding the eligibility of aliens for federally supported welfare programs.
 
 
 47
 The denial of the plaintiffs' motion for a preliminary injunction is affirmed.
 
 
 48
 AFFIRMED.
 
 CANBY, Circuit Judge, dissenting:
 
 49
 With all due respect, I dissent. We are dealing here with a group of plaintiffs who have entered this country illegally or who have overstayed their visas after entering legally. They have applied for asylum, which our statutes authorize for those who cannot or will not return to their own countries "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. Sec. 1101(a)(42). The government form on which they made their applications advises them: "You may remain in the United States until a final decision is made on your case (or you are notified otherwise by [the Immigration and Naturalization] Service)." Some 45 days after their applications are received, they are subjected to a preliminary INS interview to discourage frivolous applications. Then they wait--currently from three to six years--for their asylum applications to be processed. While they wait, they cannot work unless they are granted a work permit, issued in the discretion of the INS. None of the named plaintiffs has received a work permit. More than one-fourth of the applicants, if present figures hold true, will ultimately be granted asylum. It is fair to say that all hope to. Yet, they are denied the wherewithal to eat during this three to six year period because, under the Secretary's interpretation of 42 U.S.C. Sec. 602(a)(33), they are not "permanently residing in the United States under color of law." I cannot accept the Secretary's interpretation as reasonable.
 
 
 50
 I agree with the majority's conclusion, contrary to the contention of the Secretary, that plaintiffs are here "under color of law." Plaintiffs remain in this country with the knowledge and express acquiescence of our government. That is enough; "under color of law" is clearly intended to be more expansive than the term "lawfully admitted," which appears in the same statutory section.
 
 
 51
 Where I part company with both the majority and the Secretary is in the interpretation of "permanently." As the majority concedes and the Second Circuit has decided, "permanently" in this statutory context does not mean "forever." See Holley v. Lavine, 553 F.2d 845, 851 (2d Cir.1977), cert. denied, 435 U.S. 947, 98 S.Ct. 1532, 55 L.Ed.2d 545 (1978). "Permanent" as defined in the Immigration Act means:
 
 
 52
 a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with the law.
 
 
 53
 8 U.S.C. Sec. 1101(a)(31) (1982). Under the facts of this case, plaintiffs' residence in this country is "of continuing or lasting nature." At the minimum, it will last three to six years; for over one-fourth of the plaintiff class, it will last much longer. Most important, plaintiffs' status is easily "distinguished from temporary," as the statute specifies. "Temporary" or "temporarily" is used in Sec. 1101(a) of the Act in reference to students admitted to pursue a course of study (15)(F)(1), to tourists and business visitors, (15)(B), to workers admitted for particular jobs, (15)(H)(i), (ii) and (iii), (15)(J), and to those in programs designated by the State Department for teaching or research, (15)(J). The common characteristics of all of these temporary relationships is that they exist for a defined purpose with a defined end, and there is never any intention of abandoning the country of origin as a home. None of the temporary relationships is similar in character to that of plaintiffs, whose applications for asylum are necessarily premised on their being "unable or unwilling" to return to their countries. See 8 U.S.C. Sec. 1101(a)(42). Plaintiffs are here in an indefinite status awaiting a ruling on their application for yet another status of indefinite duration.
 
 
 54
 It is not quite accurate to suggest, as the majority opinion does, that the plaintiffs' residence is temporary because their "continued presence is solely dependent upon the possibility of having [their] application[s] for asylum acted upon favorably." Supra, p. 1462. The plaintiffs have been informed by the INS that they will be allowed to remain in this country until their applications are acted upon. Their continued presence ends (for about three-fourths of them) upon un favorable action by the Attorney General or his delegate. In this regard, plaintiffs' status is most analogous to that of temporary parolees and conditional entrants, both of whom are included among those eligible for AFDC as "permanently residing in the United States under color of law." See 42 U.S.C. Sec. 602(a)(33).
 
 
 55
 The majority opinion states that the status of temporary parolees is different because they have been admitted into the country by an official act of the Attorney General, and that the discretion of the Attorney General to admit such parolees is quite limited. But, as the majority acknowledges, prior to the Refugee Act of 1980, temporary parole was used ad hoc to permit large groups of aliens physically to enter the United States pending determination of their admissibility, for asylum or otherwise. See United States v. Kavazanjian, 623 F.2d 730, 732-35 (1st Cir.1980). No individual determination or legitimation of status occurred at the time of parole, but the parolees were eligible for AFDC. As the majority opinion points out, the Refugee Act largely replaced these wholesale paroles of asylum applicants with a system where aliens within the country could apply for asylum. While their applications are pending, the INS assures them that they will be allowed to remain in the country. Their status is so nearly identical to that of the pre-1980 parolees that I cannot conclude that Congress intended different treatment under the AFDC laws which pre-existed the Refugee Act. Certainly nothing that Congress said or wrote in the Refugee Act or in its legislative history expressly requires that such a distinction be made.
 
 
 56
 Plaintiffs are also at least as permanent in their status as are aliens who have been granted an indefinite stay of deportation or an indefinite voluntary departure. The latter two groups are eligible for SSI benefits as aliens "permanently residing in the United States under color of law." 20 C.F.R. Sec. 416.1618(a)(5) and (6). They, too, may remain in the country until, and only until, the INS takes action to end their indefinite stays.
 
 
 57
 I conclude, therefore, that the Secretary's interpretation of section 602(a)(33) is not a reasonable one, and that plaintiffs are "permanently residing in the United States under color of law" within the meaning of that statute. It is true that such a determination has large consequences. The Service makes much of the fact that nearly three-fourths of the asylum applicants will ultimately be unsuccessful. No figures are given as to how many temporary parolees, conditional entrants, or aliens under indefinite stays of deportation are also ultimately unsuccessful in remaining in this country, but all of those groups are eligible for federally-assisted benefits while they are allowed to be here. But even if the Service is conceded its point, what of the more than one-fourth of these applicants whose applicants will ultimately be successful? They will be persons who cannot return to their countries because of persecution or the well-founded fear of it. This country will have recognized that fact and will have given them asylum, but only after a period of three to six years during which they were permitted to remain in the United States, were for the most part forbidden to work, and were denied the means to feed, clothe and house their families. I cannot ascribe to Congress, in passing the Refugee Act for clearly humanitarian purposes, an intent to require victims of persecution to run that kind of gauntlet. I accordingly dissent.
 
 
 
 [1]
 The district court had jurisdiction under 28 U.S.C. Secs. 1331, 1343, 1361 (1982); 5 U.S.C. Sec. 702 (1982); and 42 U.S.C. Sec. 405(g) (1982). This court has jurisdiction under 28 U.S.C. Sec. 1292(a)(1) (1982) to review the district court's denial of the plaintiffs' motion for a preliminary injunction. The aliens' appeal is timely
 
 
 [2]
 While awaiting the outcome of this appeal, the district court certified the plaintiffs' suit as a class action
 
 
 [3]
 The district court decided that the aliens had failed to demonstrate any chance of success on the merits. To obtain a preliminary injunction, the moving party must "demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in that party's favor." Lynch, 747 F.2d at 534 n. 9; Sports Form, Inc., 686 F.2d at 753. "The 'irreducible minimum,' however, is that the moving party demonstrate 'a fair chance of success on the merits' or 'questions ... serious enough to require litigation.' " Id. at 753 (quoting Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers, 584 F.2d 308, 315 (9th Cir.1978), cert. dismissed, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979)). Where there is no chance of success at all, the moving party fails both tests. Lynch, 747 F.2d at 534 n. 9. The district court applied the correct standard for preliminary relief
 
 
 [4]
 To repeat, for consideration in the determination of AFDC benefits, 42 U.S.C. Sec. 602(a)(33) requires that an alien must be either "lawfully admitted for permanent residence" or "otherwise permanently residing in the United States under color of law." The plaintiffs do not contend at this stage that they are "lawfully admitted for permanent residence." The question presented, then, concerns the contours of the second phrase
 
 
 [5]
 In addition to its reference to the asylum provisions of 8 U.S.C. Sec. 1158, section 602(a)(33) mentions three other immigration statutes. It deems to be "permanently residing in the United States under color of law" aliens "lawfully present as a result of the application of" provisions relating to the admission of refugees, see 8 U.S.C. Sec. 1157(c) (giving the Attorney General discretion to admit refugees, subject to certain numerical limitations), temporary parolees, see id. Sec. 1182(d)(5) (giving the Attorney General discretion to parole aliens into the United States temporarily "for emergent reasons or for reasons deemed strictly in the public interest"), and conditional entrants admitted under the laws in effect prior to the passage of the Refugee Act of 1980, Pub.L. No. 96-212, 1980 U.S.Code Cong. & Ad.News (94 Stat.) 102, see 8 U.S.C. Sec. 1153(a)(7) (repealed by the Refugee Act)
 
 
 [6]
 We reject the appellants' contention that a consent judgment and subsequent order entered against the Secretary in Berger v. Secretary of the Department of Health & Human Servs., No. CV-76-1420 (E.D.N.Y. May 14, 1984), binds the Secretary to a more flexible eligibility standard that embraces asylum applicants. Berger involved the eligibility of aliens for SSI benefits under a statutory provision limiting eligibility to aliens who are "permanently residing in the United States under color of law." See 42 U.S.C. Sec. 1382c(a)(1)(B) (1982). In the original consent judgment, entered in 1978, the Secretary's predecessor agreed that
 [a]ny other alien residing in the United States with the knowledge and permission of the [INS] and whose departure from the United States the [INS] does not contemplate enforcing is also permanently residing in the United States under color of law.
 (emphasis added). In 1984, the court denied the Secretary's motion for relief from the judgment under Fed.R.Civ.P. 60(b)(5). The appellants submit that asylum applicants reside in the United States with the knowledge and permission of the INS and that the INS does not contemplate enforcing the applicants' departures until the application process has run its course.
 To implement the consent judgment, the Secretary promulgated a revised Program Operations Manual System (POMS) in October, 1984. By its terms, the revised POMS exclude asylum applicants from the coverage of the Berger formulation. A note on page 9 of the transmittal containing the revised POMS indicates that--with one exception of no relevance to the instant case--the mere filing of an application for a change in status, standing alone, does not constitute a sufficient basis to find that an alien is permanently residing in the United States under color of law. As the POMS expressly provide that aliens granted asylum are eligible for SSI, see Revised POMS GN E00303.070B.2.i (Transmittal No. 7, SSA Pub. No. 68-0200303, Oct. 24, 1984), this note reflects the Secretary's interpretation that applicants for asylum status are not eligible. Thus, even if the Secretary were bound to the standard imposed by the Berger consent judgment, we conclude that asylum applicants would not be entitled to benefits under that standard.
 
 
 [7]
 The court considered a version of Sec. 233.50 that antedated 42 U.S.C. Sec. 602(a)(33). That version differed from Sec. 602(a)(33) only in that it contained no reference to the Refugee admission provisions enacted as part of the Refugee Act of 1980, 8 U.S.C. Secs. 1157-1158
 
 
 [8]
 The appellants also cite a variety of cases finding aliens who have applied for but not yet received a change of status eligible for welfare benefits under various programs employing the operative language of Sec. 602(a)(33). In Antillon v. Department of Employment Sec., 688 P.2d 455 (Utah 1984), for example, an illegal alien claimed unemployment benefits under a state welfare program. Antillon had filed for permanent residency. After a long period of inaction, the INS granted him one month to leave the country voluntarily. After overstaying that period, Antillon applied for a suspension of deportation. The INS took no further action. Id. at 457. The Utah Supreme Court decided that Antillon was entitled to benefits. His "residence was ... under color of law because the INS knew of it and acquiesced in it by exercising its discretion not to enforce the law." Id. at 459. Intermediate courts in New York employed identical reasoning in Papadopoulos v. Shang, 67 A.D.2d 84, 414 N.Y.S.2d 152 (1979) (alien found entitled to Medicaid benefits during pendency of her application for change of status) and in St. Francis Hosp. v. D'Elia, 71 A.D.2d 110, 422 N.Y.S.2d 104 (1979) (alien whose nonimmigrant visa had expired and whose application for an immigrant visa was pending found entitled to medical assistance), aff'd, 53 N.Y.2d 825, 440 N.Y.S.2d 185, 422 N.E.2d 830 (1981). See also Velasquez v. Secretary of the Dep't of Health & Human Servs., 581 F.Supp. 16 (E.D.N.Y.1984) (requiring the Secretary to come forward with some explanation for the INS's inaction regarding an alien claimant's deportation before concluding that the alien was not "permanently residing in the United States under color of law" and therefore ineligible for SSI benefits). Neither Antillon, Papadopoulos, nor St. Francis Hospital considered whether the aliens were staying in the United States "permanently," however
 
 
 [9]
 The alien granted asylum resides in the United States permanently, even though asylum, like the grant of temporary parole, is a status which the Attorney General may at some later point revoke. See 8 U.S.C. Sec. 1158(b) (1982) (the Attorney General may terminate asylum, if owing to a change of circumstances in the alien's home country, the alien is no longer a refugee as defined in 8 U.S.C. Sec. 1101(a)(42)); id. Sec. 1182(d)(5)(A) (giving the Attorney General discretion to end temporary parole)
 
 
 [10]
 We express no view on the question whether an alien who applies for asylum at the border or at a port of entry and is allowed to enter the United States pending the disposition of the application is entitled to AFDC benefits under Sec. 602(a)(33)
 
 
 [11]
 The same test was used in administering the Food Stamp program, see 7 C.F.R. Sec. 271.1(e) (1976), until Congress tightened the requirements for eligibility in 1977, see 7 U.S.C. Sec. 2015(f) (1982)
 
 
 [12]
 The appellants' reliance on regulations defining food stamp eligibility prior to Congress' revision of the food stamp program in 1977, see Food and Agriculture Act of 1977, Pub.L. No. 95-113, Sec. 1301(6)(f), 1977 U.S.Code Cong. & Ad.News (91 Stat.) 913, 966-67 (codified at 7 U.S.C. Sec. 2015(f)), is similarly unavailing. Admittedly, the regulation, 7 C.F.R. Sec. 271.1(e) (1976), used the language at issue here. The House committee that drafted the new statute in 1977, however, read that regulation as limiting eligibility to the specific categories of aliens enumerated there. See H.R.Rep. No. 464, 95th Cong., 1st Sess. 146, reprinted in, 1977 U.S.Code Cong. & Ad.News 1704, 1978, 2116. Although those categories included aliens temporarily paroled into the United States and aliens granted indefinite stays of deportation or indefinite voluntary departure, this offers no support to the plaintiffs' position. As has been discussed, aliens who apply for asylum and temporary parolees do not occupy comparable positions. In addition, that aliens granted indefinite stays of deportation or indefinite voluntary departure meet the requirements for AFDC eligibility comports with the Secretary's view of section 602(a)(33)
 
 
 [13]
 The Supreme Court has struck down state laws that are inconsistent with federal welfare provisions only in situations where the state law denied benefits to individuals who were otherwise eligible under federal standards. See, e.g., Carleson v. Remillard, 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972); Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Carleson struck down a state regulation defining the eligibility requirement of the continued absence of a parent from the home to exclude parents absent due to military service, where the Social Security Act defined "continued absence" to mean absence for any reason. Townsend invalidated a state law denying AFDC benefits to 18-20 year-old dependent children attending college, where federal law deemed such children to be eligible. Wyman held invalid a state law decreasing AFDC benefits to certain claimants as contravening an amendment to the Social Security Act requiring states to adjust benefit levels upwards to reflect cost of living increases. And King invalidated a state regulation denying benefits to the children of a mother who "cohabited" with a man without regard to whether that man bore any legal obligation to support the children as conflicting with federal law conferring eligibility where one parent is continually absent and defining "parent" to include only adults having a legal support obligation
 
 
 [14]
 The appellants raise and reject two interests served by the Department's classification: preservation of the public fisc and deterence of illegal immigration. The plaintiffs correctly point out that a concern for fiscal integrity is not a compelling justification for an otherwise invidious classification. See Graham v. Richardson, 403 U.S. 365, 375, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971). Moreover, such a concern, standing alone, would not justify a state law discriminating against illegal aliens. Plyler v. Doe, 457 U.S. 202, 227, 102 S.Ct. 2382, 2400, 72 L.Ed.2d 786 (1982). Finally, even if the state has a substantial interest in deterring illegal immigration, the plaintiffs assert that no evidence indicates that denying AFDC benefits to asylum applicants would further this goal. See id. at 228-29, 102 S.Ct. at 2400-01 (rejecting similar argument offered in support of a state law denying free public education to the children of illegal aliens)
 
 
 [15]
 See also id. at 225, 102 S.Ct. at 2399 ("[T]he States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal."); DeCanas v. Bica, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) (upholding state law applying criminal sanctions to employers who knowingly hire illegal aliens against challenge that the law was preempted by federal immigration policy)