[No. A072388. First Dist., Div. Five. July 18, 1996.]

TSILIA KHASMINSKAYA, Plaintiff and Respondent, v.
ROGER LUM, as Director, etc., et al., Defendant and Appellant.

**COUNSEL**

Kelvin H. Booty, Jr., County Counsel, and William E. Rundstrom, Assistant County Counsel, for Defendant and Appellant.

Jodie Berger for Plaintiff and Respondent.

**OPINION**

**PETERSON. P. J.**—In this case, we hold that applicants for political asylum do not qualify for general assistance (GA) benefits, because they are not "lawfully resident" under Welfare and Institutions Code section 17000

(section 17000) until their asylum applications are granted. We also reject the contention that constitutional principles of equal protection require the payment of general assistance benefits to persons who are not "lawfully resident" in this country.

Respondent Tsilia Khasminskaya came to the United States as a visitor, and later applied for political asylum. While her asylum application was pending, respondent also sought GA benefits from appellant Alameda County Social Services Agency (the county). Respondent was denied GA benefits on the grounds that she was not yet "lawfully resident" as is required by the provisions of section 17000. Respondent then brought this proceeding seeking a writ of mandate requiring the county to pay her GA benefits, and the trial court granted the petition.

We reverse the trial court's ruling following precedent established by other appellate courts. We hold that applicants for asylum, such as respondent, do not thereby become "lawfully resident" as required by section 17000 and, thus, are not entitled to GA welfare benefits until the time their applications for asylum are granted. In so holding, we also reject respondent's argument that constitutional principles of equal protection require California to provide welfare benefits to aliens who are not yet lawfully resident in this country.

## I. Facts and Procedural History

The relevant facts are not in dispute. Respondent Khasminskaya was born in the former Union of Soviet Socialist Republics in 1919. In 1991, respondent came to this country from Kiev, Ukraine to visit her sister in Berkeley, California. Shortly thereafter, respondent received a letter from friends in Ukraine which told her that it might be unsafe for her to return, due to violence and civil unrest. In January 1992, respondent applied to the federal Immigration and Naturalization Service (INS) for political asylum. Her application was pending with the INS for three years, and was not granted until February 1995.

During the period from January 1992 to February 1995, respondent was an applicant for political asylum whose application had not yet been acted upon. She was not deportable during the pendency of her application, and she had been issued a work authorization card and Social Security Administration card based upon her application. The INS had also made a preliminary determination that her application was not frivolous.

From 1991 to 1992, respondent lived with her sister, who also gave her financial assistance until 1994. In 1994, while her application for asylum

was pending and not yet granted, respondent applied to the county for GA benefits. The county denied respondent's application for GA benefits in April 1994, on the grounds that an asylum applicant who has applied for, but not yet been granted, political asylum is not "lawfully resident" to qualify for GA pursuant to section 17000 and the county's regulations which implement section 17000 until the application is granted.

In January 1995, respondent brought a petition for a writ of mandate in the superior court, seeking to overturn the county's denial of GA benefits based upon respondent's immigration status as an applicant for political asylum. The trial court after a hearing granted the petition in September 1995. The county then brought this appeal from the trial court's ruling.

## II. DISCUSSION

### A. *Respondent Was Not "Lawfully Resident" Until Her Political Asylum Application Was Granted*

■ We begin with the statutory scheme for GA benefits. Since at least 1901, each California county has been required by state law to provide financial support to all indigent persons "lawfully resident" in the county. (Stats. 1901, ch. CCX, § 1, p. 636.) This requirement is now stated in section 17000 as follows: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, *lawfully resident* therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." (Italics added.)[1]

These GA benefits provide an important safety net for the destitute who are not supported by relatives or private charity, and especially for those who do not qualify for other more generous federal-state welfare programs, such as Aid to Families with Dependent Children (AFDC) or Supplemental Security Income. By state law, however, GA benefits have been limited to those "lawfully resident" in each county, and the case law confirms that the term "lawfully resident" as used in section 17000 does not include citizens of other countries who are present here on a temporary, undocumented, or illegal basis, even though the term would include foreign nationals who have been granted legal permanent residence. (See *Bay General Community Hospital* v. *County of San Diego* (1984) 156 Cal.App.3d 944, 960-961 [203

---

[1]The county's regulation No. 9-2-3.412 requires aliens eligible for GA to be "lawfully admitted to the United States for permanent residence or permanently residing in the United States under color of law (PRUCOL)." Regulation No. 9-2-3.453 provides that asylum applicants awaiting action on their applications therefor are not aliens eligible for the county's GA welfare benefits.

Cal.Rptr. 184] [Section 17000 does not include "undocumented indigent aliens" as persons "lawfully resident" and entitled to county relief.].) Therefore, benefits need not be paid to undocumented aliens, or to aliens who are lawfully present in this country but not lawfully resident, such as tourists or visitors. (See *Mathews* v. *Diaz* (1976) 426 U.S. 67, 82-83 [48 L.Ed.2d 478, 491-492, 96 S.Ct. 1883] (*Mathews*) [Welfare benefits may be denied to aliens who are not *lawful* residents.]; *Graham* v. *Richardson* (1971) 403 U.S. 365, 378-379 [29 L.Ed.2d 534, 545-546, 91 S.Ct. 1848] [States may not refuse welfare benefits to "lawfully admitted resident aliens."].)

In a series of cases dealing specifically with applicants for political asylum, the Ninth Circuit Court of Appeals and the Second District Court of Appeal have both ruled that asylum applicants do not yet meet the relevant legal standard of " 'permanently residing . . . under color of law' " (the PRUCOL standard) and, therefore, do not qualify for AFDC welfare benefits under either federal or state law. (*Sudomir* v. *McMahon* (9th Cir. 1985) 767 F.2d 1456, 1459-1462 (*Sudomir*); *Zurmati* v. *McMahon* (1986) 180 Cal.App.3d 164, 173-175 [225 Cal.Rptr. 374] (*Zurmati*).)

In *Sudomir*, *supra*, the majority acknowledged the issue was a close one, but ruled that asylum applicants who have not yet been granted asylum status are not yet permanently residing under color of law and, therefore, are not yet entitled to welfare benefits under the federal-state AFDC program. (767 F.2d at pp. 1459-1462.) The lone dissenter noted that about one-fourth of those who apply for asylum will in fact be granted asylum, and suggested that applicants are here " 'permanently' " at least on an interim basis, until their applications are denied. (*Id.* at pp. 1467-1468 (dis. opn. of Canby, J.).)

The majority opinion in *Sudomir* was followed by the Second District in *Zurmati*, *supra*, As the *Zurmati* court observed, "An applicant for political asylum is one who seeks that status, but does not have it." (180 Cal.App.3d at p. 175.) Therefore, the *Zurmati* court concluded asylum applicants are not yet entitled to welfare benefits under the AFDC program: "We find that the status of an applicant for political asylum is not the same as that of an alien who has been granted political asylum. To hold otherwise would be to render meaningless the provisions of 42 United States Code section 602(a)(33) and 45 Code of Federal Regulations section 233.50(b)(3) which provide that aliens lawfully present in the United States, *who have been granted* political asylum by the Attorney General, are 'permanently residing in the United States under color of law.' Such a holding would make it possible for every alien who is present illegally in the United States to change his own status by the simple act of making an application for political asylum and thereby to clothe himself with all of the benefits and privileges of an alien who has

been lawfully admitted under the applicable laws and regulations. Such a result would be an absurdity and it is the duty of courts to construe statutes so as to avoid absurd results." (Pp. 175-176, italics in original.)

Respondent and the trial court failed to acknowledge the force of these authorities. They relied instead upon a single Ohio case, *Vespremi* v. *Giles* (1980) 68 Ohio App.2d 91 [427 N.E.2d 30, 31-32] (*Vespremi*). The *Vespremi* case is inapposite to the issue before us. It dealt with an applicant for political asylum who was denied unemployment benefits, when he had qualified for such benefits under a prior provision of Ohio law merely by working in Ohio and by being lawfully *admitted* to this country. The *Vespremi* court held, under this very different statutory scheme, that the applicant was entitled to benefits under the provisions of Ohio law because he had done the required work and had been "lawfully admitted" on a short term visa before he applied for asylum. The *Vespremi* case did not deal with welfare benefits where eligibility is determined (as in section 17000) by lawful *residence*; instead it dealt with an insurance scheme under state law for which the asylum applicant had qualified through working legally in covered employment and by mere lawful admission to the country. Unfortunately, the trial court in our case was apparently unaware of another and later Ohio case not cited by the parties, which held (following *Sudomir*) that applicants for political asylum are *not* entitled to welfare benefits under current law because they are not " 'lawfully present under provisions of the Immigration and Nationality Act' " and, therefore, are not " 'permanently residing . . . under color of law.' " (*Joudah* v. *Ohio Dept. of Human Serv.* (1994) 94 Ohio App.3d 614 [641 N.E.2d 288, 291].) Therefore, this detour into Ohio law does not aid respondent.

Respondent also presents a related argument in an attempt to distinguish her case from the other asylum applicant cases cited in this opinion. Respondent concedes, in deference to *Sudomir*, that she did not have the status of a person " 'permanently residing . . . under color of law,' " or PRUCOL status, while she was merely an applicant for asylum and, therefore, she would not qualify for AFDC benefits. She contends, however, that she qualifies for GA benefits because she was in this country, even if not permanently, " 'under color of law' " since she was a bona fide applicant for asylum, whose application was certainly not frivolous, who had been lawfully admitted on a short term visa, and who was granted an authorization to work during the pendency of her application. This characterization of the facts fails to aid respondent. (Cf. *Sudomir*, *supra*, 767 F.2d at pp. 1466-1467.) Indeed, her concession that she did not yet have full PRUCOL status would appear to concede away her case. (See *Zurmati*, *supra*, 180 Cal.App.3d at pp. 175-176.)

In addition to her impermanent " 'under color of law' " status, respondent also contends (and the county does not dispute) that she was a resident of the county. Though she was not "permanently" residing under color of law, since her residence was only tolerated by the INS while it was processing her asylum application, respondent contends she was nevertheless "lawfully resident" within the county for purposes of section 17000, because she was a resident, and her *presence* was lawful during the pendency of her asylum application. However, an alien's lawful presence in a California county does not establish that such person was "lawfully resident" before the asylum application was granted. (See *Zurmati*, *supra*, 180 Cal.App.3d at pp. 175-176.)

We acknowledge that respondent's INS status was very different from that of an undocumented alien. Respondent came to this country lawfully, was admitted lawfully on a visitor's visa, and afterwards applied for political asylum. She could not be deported until her asylum application was formally denied. As such, her continued *presence* in this county was tolerated by law in the limited sense that respondent possessed valid documentation which would prevent detention by the INS or immediate deportation; she was therefore present, though not yet permanently, under color of law. (See *Sudomir*, *supra*, 767 F.2d at pp. 1466-1467.)

However, section 17000 required that respondent also be "lawfully resident." Her *residence* had to be established as lawful. It is not enough under the statute that her presence was tolerated on an interim basis by the INS, because her residence was not yet established as lawful on a permanent basis. (See *Zurmati*, *supra*, 180 Cal.App.3d at pp. 175-176.) While we also recognize that section 17000 by its terms does not require that a lawful resident must also be a permanent resident, respondent could not be a lawful resident anywhere in California until her immigration status had been made lawful on some permanent basis. (*Zurmati*, *supra*, 180 Cal.App.3d at pp. 175-176.) The situation, of course, would be different if section 17000 only required that a person's presence in a county be "legally tolerated" in order to qualify for benefits. However, section 17000 required that respondent be "lawfully resident" not merely "legally tolerated."

Since respondent concedes she did not yet have PRUCOL status, she was not yet lawfully resident for purposes of section 17000. Only when her asylum application was granted and respondent gained full PRUCOL status did she also become lawfully resident. (See *Zurmati*, *supra*, 180 Cal.App.3d at pp. 175-176.) Of course, when that happened, respondent would apparently become eligible for a panoply of federal welfare benefits which were much more generous than the GA benefits in issue here.

We conclude that under section 17000, an applicant for political asylum is not yet "lawfully resident" for purposes of payment of GA benefits until the asylum application is granted.

### B. *Constitutional Principles of Equal Protection Do Not Require Payment of Welfare Benefits to Foreign Nationals Who Are Not Yet "Lawfully Resident"*

█    We also reject respondent's contention that constitutional principles of equal protection are violated if asylum applicants are not granted GA benefits under section 17000. Principles of equal protection of the laws are not violated by limiting governmental benefits to persons who are established to be "lawfully resident" under INS laws and regulations.

The Ninth Circuit in *Sudomir, supra,* held that although aliens may not be discriminated against through the denial of equal protection of the laws, state laws do not violate equal protection principles by conditioning welfare benefits upon lawful residency as determined under federal law and INS regulations. (767 F.2d at pp. 1466-1467.)

Further, in *Regents of University of California* v. *Superior Court* (1990) 225 Cal.App.3d 972, 980-981 [276 Cal.Rptr. 197] (*Regents*), the Second District held that equal protection was not violated by an analogous provision of state law. The law in issue in *Regents* provided that foreign nationals who are not yet legal residents should not be entitled to the lower tuition fees charged to legal residents in state universities. As the *Regents* court observed: "We are unaware of any authority forbidding a state, on equal protection grounds, to provide services to its lawful residents that it denies to others." (P. 980.)

In *Blanco* v. *McMahon* (1988) 198 Cal.App.3d 473, 478-479 [243 Cal.Rptr. 736], the Second District also held that equal protection principles did not require the payment of welfare benefits to foreign nationals who are not lawfully resident aliens. (Cf. also *People* v. *Sanchez* (1987) 190 Cal.App.3d 224, 229 [235 Cal.Rptr. 264] ["Despite . . . contentions to the contrary, legal residents of the United States and illegal residents are not persons 'similarly circumstanced' which the federal and state Constitutions require to be treated alike."].)

Respondent finally contends equal protection principles were violated because she was denied GA benefits, while other aliens with a better claim to being "lawfully resident" were granted benefits. She points to such subcategories as aliens who have been found to be deportable but who have

been granted an "indefinite" stay of deportation by the INS for humanitarian reasons, such as by being the caretaker of a child who is a citizen. Those persons, formally granted an individual status of "indefinite" stay of deportation, would qualify for GA benefits as "lawfully resident" under the county's internal regulations. However, equal protection principles do not require that all aliens be treated alike, when they are not similarly situated for purposes of federal immigration law. It is constitutionally valid to distinguish *among* aliens and grant benefits to some who have a lawful residence status, but not to all aliens, however transient, impermanent, or unlawful. (See *Mathews, supra,* 426 U.S. at p. 83 [48 L.Ed.2d at p. 492] ["In short, citizens and those who are most like citizens qualify [for benefits]. Those who are less like citizens do not."].) A person (unlike respondent) who is granted lawful residence in this country on an "indefinite" basis has received from the INS an official authorization to remain on a permanent basis, similar to an asylum applicant whose application has been granted, and could appropriately qualify as "lawfully resident" under section 17000.

Constitutional principles of equal protection do not require the states to ignore the fact that lawful residence has not yet been formally authorized by the INS for a person who has only applied for, but has not yet received, asylum status. (See *Sudomir, supra,* 767 F.2d at p. 1466 ["It would make no sense to say that Congress has plenary power in the area of immigration and naturalization and then hold the Constitution impels the states to refrain from adhering to the federal guidelines."].)

III. DISPOSITION

The trial court's judgment is reversed, and the matter is remanded to the trial court with directions to deny the petition. Each party shall bear its own costs.

Haning, J., and Ely, J.,* concurred.

A petition for a rehearing was denied August 13, 1996.

---

*Judge of the Solano Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.