VIRGINIA MELTON ET AL. *v*. AUDREY ROWE ET AL.

| SUPERIOR COURT | JUDICIAL DISTRICT OF NEW HAVEN | FILE NO. 334471 |

Memorandum filed August 14, 1992

*Shirley Bergert* and *Deborah Witkin,* for the named plaintiff et al.

*M. Gould,* for the named plaintiff et al., and the plaintiff Thomas Saleeba.

*Hugh Barber, Nyle K. Davey* and *Richard J. Lynch,* assistant attorneys general, and *Richard Blumenthal,* attorney general, for the named defendant.

*John M. Casey,* for the defendant Virginia Wehrli.

*Christopher P. Hankins,* staff attorney for the defendant Anne Marie Whitney.

*Corporate attorney of the town of Middletown,* for the defendant Annette Ward.

*Corporation counsel of the city of New Haven,* for the defendant Raymond Lopes.

DEMAYO, J. During the May special session, the General Assembly enacted Public Acts 1992, No. 92-16, which became effective on July 1, 1992. It was signed by the governor on June 8. Public Acts 1992, No. 92-16 § 2 (a) provides: "The commissioner of income maintenance shall adopt regulations in accordance with the provisions of chapter 54 establishing mandatory standards for the granting of general assistance financial and medical assistance, including the [minimum] level of FINANCIAL assistance to be provided at the expense of the towns in such cases, WHICH SHALL BE THREE HUNDRED FOURTEEN DOLLARS PER MONTH FOR A SINGLE EMPLOYABLE PERSON AND THREE HUNDRED FIFTY-SIX DOLLARS PER MONTH FOR A SINGLE UNEMPLOYABLE PERSON UPON A DETERMINATION OF HIS UNEMPLOYABILITY . . . ."

On or about June 8, 1992, the commissioner of the department of income maintenance (commissioner), Audrey Rowe, by her deputy, issued Policy Transmittal No. GA 92-3, which instructed each municipality to implement the changes mandated by Public Act 92-16 in the manner set forth in the transmittal. The transmittal also instructed each municipality to implement the changes "despite the fact that regulations have not been promulgated."

In a letter dated June 26, 1992, the commissioner asked the governor to approve her finding of an imminent peril to the public welfare because "[t]he State Budget for the Fiscal Year 1992–93 is predicated on realizing savings from the above mentioned changes beginning on July 1, 1992. We have become seriously concerned that the lack of regulations which may be necessary to implement these mandates may either delay or prohibit implementation of the changes in a timely fashion, possibly imperiling the integrity of the

Connecticut State Budget." The governor, by signing the commissioner's letter, agreed that an emergency existed.

On June 26, 1992, the legislative regulation review committee received the proposed emergency regulations, and on June 29, 1992, the regulations became effective when they were filed with the office of the secretary of the state.

On or about June 15, 1992, the department of income maintenance (department) provided the cities and towns that administer the program with notices concerning Policy Transmittal 92-3. The department suggested that all clients be provided with copies of these notices. The cities and towns apparently complied with this suggestion in a variety of ways and some clients received the notices earlier than others.

On July 1, 1992, Virginia Melton, Leda Fox, Victoria Perez, and James Harris, individually and on behalf of others similarly situated, filed a complaint seeking to prohibit the commissioner and the municipalities from "reducing, terminating or denying general assistance benefits, pursuant to recent legislative enactments, without first promulgating regulations required by the Uniform Administrative Procedures Act." Thomas Saleeba was permitted to intervene as a party plaintiff on the second day of the hearing on this motion.

The issues raised in this proceeding are: (1) whether the court has the authority to review the commissioner's determination, and the governor's approval of that determination, that there was an imminent peril to the public health, safety or welfare, which justified the promulgation of emergency regulations; (2) if the court reviews the emergency determination, whether the commission and the governor erred in determin-

ing that there was an imminent peril to the public welfare; and (3) whether the plaintiffs received adequate notice of the reductions of their benefits.

The Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., provides for the promulgation of emergency administrative regulations. General Statutes § 4-168 (f) provides in pertinent part: "If an agency finds that an *imminent peril to the public health, safety or welfare* requires adoption of a regulation upon fewer than thirty days' notice, states in writing its reasons for that finding and the governor approves such finding in writing, it may proceed without prior notice or hearing or upon any abbreviated notice and hearing that it finds practicable, to adopt an emergency regulation . . . ." (Emphasis added.) The commissioner relied on this statute in adopting emergency regulations, finding "an imminent peril to the public health, safety or welfare."

Connecticut has not specifically authorized the judicial review of an agency's finding, which was approved by the governor, that an imminent peril required the adoption of emergency regulations. Several courts, however, have allowed judicial review. In *Poschman* v. *Dumke,* 31 Cal. App. 3d 932, 941, 107 Cal. Rptr. 596 (1973), the court reviewed an agency's determination that an emergency existed because "[c]ourts are not conclusively bound by an agency's determination that an emergency exists, although it is recognized that what constitutes an emergency is primarily a matter for the agency's discretion." In *Pioneer Liquor Mart, Inc.* v. *Alcoholic Beverages Control Commission,* 350 Mass. 1, 9, 212 N.E.2d 549 (1965), the court, reviewing an agency's emergency finding pursuant to the Massachusetts Administrative Procedures Act, Mass. Gen. L. ch. 30A, stressed "that 'emergency' findings under c.30A must be carefully scrutinized because, if unwar-

rantably made, they may lead to improper denial of public hearings or comment on regulations, to evasion of the salutary purposes of c.30A and possibly to other serious abuse." In *Florida Home Builders* v. *Division of Labor,* 355 So. 2d 1245, 1247 (Fla. 1978) (Booth, J., dissenting), the court noted that "[a]n agency's assumption of emergency powers in the absence of a bona fide emergency violates basic rights of due process, and constitutes a usurpation of power. *Fuller* v. *Gardner,* 138 Fla. 837, 190 So. 442 (1939)." Finally, in *Senn Park Nursing Center* v. *Miller,* 118 Ill. App. 3d 733, 744, 455 N.E.2d 162 (1983), the court, addressing the plaintiff's contention that there was no emergency, echoed the court in *Poschman* v. *Dumke,* supra, and stated that "[t]he importance of judicial scrutiny of administrative actions cannot be overemphasized."

The commissioner argues that the agency's determination that an emergency exists cannot be reviewed because § 4-168 (f) provides additional safeguards: the governor's approval of the emergency finding and the legislative regulation review committee's approval of the proposed emergency regulations. In *Michigan Petroleum Assn.* v. *State Fire Safety Board,* 124 Mich. App. 187, 333 N.W.2d 506 (1983), however, the court reviewed an agency's finding of an emergency that was approved by the governor and certified by the attorney general. In the present case, the emergency regulations were adopted to implement reductions in the general assistance program; therefore, the court's review of the governor's approval is important because it was the governor who first proposed the reductions in state spending for the general assistance program. See *University of Connecticut Chapter, AAUP* v. *Governor,* 200 Conn. 386, 398–99, 512 A.2d 152 (1986) (governor initiates budgetary process). Furthermore, the legislative regulation review committee's approval of the regulations does not strengthen the

commissioner's finding of an emergency because it is the governor who approves the agency's finding of an emergency, not the review committee. General Statutes § 4-168 (f).

Accordingly, the court concludes that it has the authority to review an agency's determination that there was an imminent peril to the public health, safety or welfare, as defined by § 4-168 (f), despite the approval by the governor.

Having determined that it can review the emergency determination, the court must next decide whether that finding was erroneous. On review, the standard "for deciding whether an agency's finding of an emergency . . . was warranted is whether there was a 'substantial basis' for it." *American Grain Products Processing Institute* v. *Department of Public Health,* 392 Mass. 309, 323, 467 N.E.2d 455 (1984). "Such a finding 'is given every presumption in its favor and is not subject to question in judicial proceedings unless palpably wrong.' " Id., quoting *Robinson* v. *Secretary of Administration,* 12 Mass. App. 441, 450, 425 N.E.2d 772 (1981). In addition, "[t]he [commissioner] is not to be held to a standard of perfection, but merely to a standard of good faith." *Robinson* v. *Secretary of Administration,* supra, 450. The commissioner, in support of her finding of an emergency, argues that "the lack of regulations which may be necessary to implement these mandates may either delay or prohibit the implementation of the changes in a timely fashion, possibly imperiling the integrity of the Connecticut State Budget." The commissioner's argument in support of an imminent peril to the public welfare is twofold. First, the lack of regulations will result in an economic loss to the state and second, the effective date of Public Act 92-16 requires the immediate enactment of regulations to ensure full compliance with the mandates

of the act, and to prevent confusion among the municipalities administering the general assistance program.

There are no Connecticut cases or statutes that define the phrase "imminent peril to the public health, safety or welfare." "Public welfare," however, has been defined as: "[t]he prosperity, well-being, or convenience of the public at large, or of a whole community, as distinguished from the advantage of an individual or limited class. It embraces the primary social interests of safety, order, morals, economic interest, and other non-material and political interests. In the development of our civic life, the definition of 'public welfare' has also developed until it has been held to bring within its purview regulations for the promotion of economic welfare and public convenience." Black's Law Dictionary (6th Ed. 1990). In addition, a federal court has recognized a statement of emergency similar to the commissioner's as a valid justification for dispensing with the notice and comment procedures. In *Philadelphia Citizens in Action* v. *Schweiker*, 669 F.2d 877, 879 (3d Cir. 1982), two associations composed of recipients of various welfare benefits commenced an action to enjoin the Department of Health and Human Services (HHS) and the Pennsylvania department of public welfare from implementing changes in the Aid to Families with Dependent Children (AFDC) program, as mandated by the Omnibus Budget Reconciliation Act (act). On August 13, 1981, Congress enacted the act in an attempt "to reverse the growth of federal spending by systematically reducing the level of expenditures in a wide range of federal programs." Id., 878. Similar to Public Act 92-16, the act mandated major revisions in the AFDC program. Id. The effective date of the act was October 1, 1981, forty-nine days after its enactment. Id., 879.

As mandated by the act, HHS promulgated emergency rules to implement the changes. Id. In support

of the emergency regulations, the secretary of HHS argued that "congressional concern with reducing government spending immediately and the short time Congress provided for implementation of the amendments—from August 13 to October 1—made a full notice and comment procedure prior to implementation of the rules impracticable." Id., 882. In addition, the secretary argued that the "interim rules will permit the State and Federal governments to capture the greatest amount of cost savings from these provisions and this will be to the benefit of the public. We anticipate that the savings . . . from prompt implementation of these amendments will be about $2 billion and represent a substantial factor in the President's efforts to curb inflation and revitalize the economy." Id., 882 n.4.

The court, in upholding the agency's finding of an emergency, stated: "We believe that Congress, by setting an effective date so close to the date of enactment, expressed its belief that implementation of the amendments to the AFDC program was *urgent*. We cannot say that HHS, by paying heed to that congressional concern in its determination that it had good cause to promulgate interim final rules without full notice and comment, erred as a matter of law." (Emphasis added.) Id., 885. In the present case, during the May Special Session, the General Assembly passed Public Act 92-16, which had an effective date of July 1, 1992. As a result, the commissioner had less than one month to comply with the act's mandates.

Although Connecticut utilizes different language in its exception to the notice and comment procedure than the federal exception ("impracticable, unnecessary or contrary to the public interest"), Massachusetts, a state that utilizes similar language to Connecticut, has addressed whether a statutorily created deadline can create an imminent threat to the public health, safety

or welfare. In *Robinson* v. *Secretary of Administration,* 12 Mass. App. 441, 449, 425 N.E.2d 772 (1981), the secretary of administration promulgated an emergency regulation establishing a fee for semiannual safety inspections of motor vehicles and trailers, as mandated by statute, because if the regulation did not become effective immediately, "the September 1 to October 15 semiannual inspection period would have nearly passed and the Commonwealth would have lost the additional revenue irretrievably." The secretary also advanced additional justifications: "[T]hat many inspection stations were threatening to cease participation in the inspection program due to what they regarded as the inadequacy of the $2.00 fee; that the *integrity* of the program and the safety of the highways were thereby threatened; and, in addition, that the Commonwealth needed the additional revenue implicitly authorized from this source by St. 1980, c. 572, § 36." (Emphasis added.) Id. The court upheld the emergency regulation because "until the regulation in question was promulgated there was no fee validly in effect; and it is equally clear that, unless the inspectors are authorized to collect a fee, the inspection program will be thrown into *chaos.* These are legal facts of which we can take judicial notice, and which would fully justify promulgation of a fee on an emergency basis." (Emphasis added.) Id., 451. Similarly, the commissioner here argues that if the regulations were not adopted immediately, the state would lose approximately $19 million, thereby imperiling the integrity of the state budget. In addition, the commissioner argues that the general assistance program "will be thrown into chaos" unless regulations are adopted to provide guidance to the municipalities administering the program.

In *Pioneer Liquor Mart, Inc.* v. *Alcoholic Beverages Control Commission,* supra, 4, the commission adopted an emergency regulation establishing price schedules

because there was "insufficient time in this instance for the [c]ommission to comply and it being contrary to the public interest to allow the months of March and April to pass without the establishment of legal and proper [m]inimum [c]onsumer [r]esale [p]rices as authorized by [Mass. Gen. L. ch. 138] § 25C." (Internal quotation marks omitted.) The agency also argued that the emergency regulation was required "to promote temperance, to stabilize the business, to avoid price wars, to instill observance of the law, and to protect the public." (Internal quotation marks omitted.) Id., 4 n.5. The court upheld the emergency regulation, stating: "Despite the meager character of the commission's statement of the 'emergency' in respect of its approval of the price schedules, we cannot say that it was insufficient. *The commission's statement must be viewed in the light of the commission's apparent difficulty in adjusting itself to compliance with § 25C* as interpreted in the *Kneeland* decision. The record does not justify us in concluding that the commission had no substantial basis for the finding that the public interest required promulgation of some price schedule for March and April, 1963." (Emphasis added.) Id., 9–10. As in *Pioneer Liquor Mart, Inc.* v. *Alcoholic Beverages Control Commission,* supra, the commissioner's statement here of an emergency must be viewed in the light of the apparent difficulty of the department in adjusting itself to the express mandates of Public Act 92-16. "[T]he absence of specific and immediate guidance from the Department in the form of new standards would have forced reliance by the Department upon antiquated guidelines, thereby creating confusion among field administrators, and caused economic harm and disruption to those northeastern processors whose inspection lines ran at varying speeds. This harm would not have been limited to those within the boiler industry but would have extended in all likelihood to the consumer in the form

of poultry shortages or increases in consumer prices." *American Federation of Government Employees* v. *Block,* 655 F.2d 1153, 1157 (D.C. Cir. 1981). As a result of the department's apparent difficulty in adjusting to the express mandates of Public Act 92-16, the commissioner determined that failure to adopt regulations immediately would "delay or prohibit implementation of the changes in a timely fashion" because the administering municipalities would be forced to rely upon "antiquated guidelines."

It should be noted, however, that an agency cannot rely only on a mandated deadline to justify an emergency determination. In *New Jersey* v. *United States Environmental Protection Agency,* 626 F.2d 1038, 1042 (D.C. Cir. 1980), the court held: "[T]he mere existence of deadlines for agency action, whether set by statute or court order, does not *in itself* constitute good cause for a [5 U.S.C.] § 553 (b) (B) exception." (Emphasis added; internal quotation marks omitted.) This is because "[i]t is now a commonplace that notice-and-comment rulemaking is a primary method of assuring that an agency's decision will be informed and responsive. And we have previously explained that, if the Agency, in carrying out its essentially legislative task, has infused the administrative process with the degree of openness, explanation, and participatory democracy required by the [Administrative Procedure Act (APA)], it will thereby have negate[d] the dangers of arbitrariness and irrationality in the formulation of rules . . . ." (Internal quotation marks omitted.) Id., 1045. Unlike *New Jersey* v. *United States Environmental Protection Agency,* supra, in the present situation the commissioner lacked discretion when promulgating the emergency regulations because Public Act 92-16, § 2, mandated that benefits be reduced to $314 per month for single employable persons and $356 per month for single unemployable persons, and § 2 defined the terms employable and unemployable.

Public Act 92-16 eliminated any danger of arbitrariness and irrationality by eliminating the commissioner's substantive discretion. See *Williams* v. *Pierce,* 708 F.2d 57, 63 (2d Cir. 1983) (Mansfield, J., dissenting) ("insistence on proper procedure and attention to public comments is particularly warranted when an agency has unreviewable *substantive* discretion" [emphasis in original]). In addition, Public Act 92-16 "involved procedural requirements that would forestall implementation [statewide] of rules with little substantive effect beyond that of the statutory requirements they adhere to, on a date explicitly and recently set by [the General Assembly], relating to a comprehensive [state] program." *Philadelphia Citizens in Action* v. *Schweiker,* supra, 886.

An examination of the cases on this subject suggests that most courts invalidate emergency regulations because the agency had the ability to comply with the formal notice and comment procedure. The dissent in *Philadelphia Citizens in Action* v. *Schweiker,* supra, 891, based its opinion on the agency's ability to comply with the APA's notice and comment procedure: "If a two month time period [as in *Sharon Steel Corporation* v. *Environmental Protection Agency,* 597 F.2d 377 (3d Cir. 1979)] is not sufficient to overcome the narrowly construed good cause exception, I do not understand how an agency with six months can claim good cause." Similarly, "it would defeat the purposes of the notice and comment procedures if an agency could dispense with such procedures by enacting an emergency rule where the 'emergency' was created by the agency's failure to follow these procedures in the first place." *Senn Park Nursing Center* v. *Miller,* supra, 745. The commissioner here could not, however, have complied with the procedures specified in § 4-168 (a). Public Act 92-16 was passed during the May Special Session and had an effec-

tive date of July 1, 1992. As a result, the commissioner had less than one month to comply with the procedures in § 4-168 (a) before the act became effective.

The court adopts the reasoning in *Philadelphia Citizens in Action* v. *Schweiker,* supra, 888, because of its applicability to the present case: "Yet it bears emphasis, because the point is easily missed amid the concern over the reduction in benefits, that the validity of the benefit cuts is in no way before this Court. The reduction in benefits involved here is plainly required by [Public Act 92-16]—a fully debated act of [the General Assembly]—and not by the implementing rules of [the department]. To the extent that the appellees wish to comment on the desirability of benefit cuts, the time for such comments passed with the enactment of [Public Act 92-16]. At issue now are simply the rules of the department implementing the clear statutory directive. [The department of income maintenance] may not undo what [the General Assembly] and the [governor] have done; its discretion with respect to reducing benefits is quite narrowly defined. In judging the validity of the procedure by which its rules were promulgated, we must not be swayed by our views of the desirability of the underlying statutory policy that [the department] is bound to implement."

It is the conclusion of the court that the commissioner acted in good faith when adopting the emergency regulations, and the determination that there was an imminent peril to the public welfare did not lack a substantial basis and was not palpably wrong.

While the aforementioned conclusions are also dispositive of the notice claims raised by the plaintiffs, the plaintiffs have raised a due process claim in this action.

An examination of the notice forms and the fair hearing process offered to recipients compels the conclu-

sion that the recipients have been afforded such reasonable notice as to satisfy due process requirements.

It should be noted that the status of married couples under Public Act 92-16 is unclear and the department will be obliged to consider their circumstances in light of the brief pronouncements of this act.

The court cannot conclude, however, that this shortcoming is sufficient to warrant the extraordinary relief requested.

In view of the court's findings as to the emergency determination and the forms of notice, the plaintiffs' motion for temporary injunction is denied.