[No. A076721. First Dist., Div. Five. Aug. 25, 1997.]

CARMEN DOE et al., Plaintiffs and Respondents, v.
PETE WILSON, as Governor, etc., et al., Defendants and Appellants.

COMMUNITY HEALTH FOUNDATION OF EAST LOS ANGELES,
Plaintiff and Respondent, v.
PETE WILSON, as Governor, etc., et al., Defendants and Appellants.

298

**COUNSEL**

Daniel E. Lungren, Attorney General, Charlton G. Holland, III, and John H. Sugiyama, Assistant Attorneys General, and Douglas M. Press, Deputy Attorney General, for Defendants and Appellants.

Daniel J. Popeo, Richard A. Samp and Patrick J. Manshardt as Amici Curiae on behalf of Defendants and Appellants.

Louise H. Renne, City Attorney, Paula Jesson and Jean S. Fraser, Deputy City Attorneys, Robert D. Newman, Lucy Quacinella, Richard A. Rothschild, Laura C. Fry, Yolanda Vera, Tanya Broder, Jodie Berger, Eugenie Denise Mitchell, Lourdes Rivera and Edward P. Howard for Plaintiffs and Respondents Carmen Doe et al.

Richard P. Fajardo for Plaintiff and Respondent Community Health Foundation of East Los Angeles.

Catherine I. Hanson and Astrid G. Meghrigian as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**PETERSON, P. J.**—In this case, we will reverse a trial court's preliminary injunction barring the State of California's enforcement of its interim emergency regulations enacted to comply with federal legislation, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (8 U.S.C. § 1601 et seq.) (the PRA).

The PRA was enacted pursuant to the plenary authority of the federal government over immigration matters. The PRA, inter alia, enacted new eligibility rules for provision of public assistance by states or local entities to undocumented or illegal aliens, and eliminated the eligibility of such aliens (with certain exceptions not here applicable) for "any State or local public benefit" (8 U.S.C. § 1621(a)), defined as including "any . . . health . . . benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government" (id., subd. (c)(1)(B)). After the effective date of the PRA, illegal aliens can only become eligible for such benefits "through the enactment of a State law after August 22, 1996 which affirmatively provides for such eligibility." (Id., subd. (d).)

The PRA, thus, prohibited states, after August 22, 1996, from expending public funds to furnish illegal aliens with routine prenatal health services as California had theretofore done, unless new state legislation to the contrary was thereafter enacted. California has not enacted any such new legislation.

Appellants Pete Wilson as Governor, S. Kimberly Belshé as Director of the California Department of Health Services (DHS), and the DHS sought to

implement the PRA in the last quarter of 1996 by promulgating interim emergency regulations, to be effective December 1, 1996, and for a period of 120 days, under the provisions of Government Code section 11346.1, subdivision (b) (section 11346.1(b)) and subdivision (e). Appellants did so to conform state laws concerning such health services to the new federal law provisions of the PRA, without deferring such conformance until expiration of the full period normally required for the giving of statutory notice, the solicitation of public comments, the holding of public hearings, and the promulgation of final, nonemergency state regulations.

The injunction at issue barred the state from enforcing the emergency regulations. The trial court ruled as a matter of law that no "emergency" requiring prompt regulatory action existed, despite the enactment of a new federal law prohibiting the state program's furnishing of such prenatal health services in the future. Consequently, the state was required to continue that program, proscribed by federal law, for an extended time encompassing the full notice and comment period and the period of public hearings attendant to the promulgation of final state regulations.

Where, as here, a state program is rendered immediately illegal by the provisions of a new federal law on a subject over which the federal government has plenary jurisdiction, the state judiciary may not frustrate prompt compliance with that federal law simply by forbidding the state from issuing the necessary emergency regulations which would achieve timely state compliance with its provisions. We conclude the trial court erred by failing to accord substantial deference to the findings of the DHS of a need for interim emergency regulations under section 11346.1(b). The court's injunction cannot be sustained. It barred the timely state implementation of a new and valid federal law, effectively requiring state officials to continue a program made illegal by plenary federal law, and constituted an abuse of the trial court's discretion.

## I. FACTS AND PROCEDURAL HISTORY

The relevant facts are undisputed, and may be briefly summarized here.

In 1988, the State of California began to provide state funding for routine prenatal care for illegal aliens. The program was begun by means of emergency regulations issued by the state, after California law was changed to provide funding for these health benefits.[1]

In 1996, Congress enacted the PRA, which, inter alia, bars states and local governments from providing or funding routine, taxpayer-paid medical care

---

[1]The Legislature extended payment for "pregnancy-related services" to aliens as part of 1988 amendments to the Medi-Cal program. (Stats. 1988, ch. 1441, § 1, subd. (g), p. 4918.)

for the benefit of illegal aliens.[2] The provisions of the PRA were effective immediately upon its signing by the President in August of 1996.[3]

In enacting the PRA, Congress declared national policy continued to be that aliens in the United States not depend on public resources to meet their needs; that the availability of public benefits not constitute an incentive for immigration to the United States; that compelling government interests required enactment of new rules to assure that aliens be self-reliant consistent with national immigration policy; and that the federal government has "a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." (8 U.S.C. § 1601(2), (5), & (6).) The enactment of that federal legislation was fueled by concerns regarding a rising unauthorized immigrant population in the United States. A study under the auspices of the Immigration and Naturalization Service (INS) determined that in 1992 the population of such persons in the USA was 3.4 million of which over three-quarters were concentrated in 7 states, including California; and that California was the residence of 43 percent of that 1992 undocumented alien population, or about 1.4 million persons, which had been increasing at an estimated rate of about 125,000 per year. (Warren, *Estimates of the Undocumented Immigrant Population Residing in the United States, by County of Origin and State of Residence: October 1992* (Apr. 1994) INS.)

The parties to this appeal do not dispute that the PRA is valid and constitutional; that it became effective in August 1996; and that under the PRA, California's funding of routine medical care for illegal aliens, including routine prenatal care, presently violates the effective provisions of federal law. The PRA only allows states to provide care for emergency conditions (such as the onset of labor) or communicable diseases (such as sexually transmitted diseases) (8 U.S.C. § 1621(b)); and the parties agree that the PRA precludes the state from legally providing funding for routine prenatal care for illegal aliens, unless the state acts pursuant to legislation enacted after the effective date of the PRA (*id.,* subds. (c)(1)(B) & (d)).

In late 1996, appellants proceeded to bring California's administrative regulations into compliance with the provisions of the new federal law. This

In order to implement the 1988 law, emergency regulations were adopted amending alien eligibility standards. (See Cal. Reg. Notice Register 88, No. 45-Z, p. 3581.)

[2] The PRA bars publicly funded routine medical care by states to "an alien who is not— [¶] (1) a qualified alien" (8 U.S.C. § 1621(a)), and then defines the term " 'qualified alien' " to mean those aliens, such as legal resident aliens, persons granted asylum, political refugees, etc., who have some type of confirmed legal status, however temporary, in this country (8 U.S.C. § 1641(b)). We use the briefer terms "undocumented alien" or "illegal aliens" to specify the persons who would not be entitled to receive routine medical care under the PRA.

[3] The provisions of the PRA have an "immediate effective date." (U.S.Atty.Gen. Order No. 2049-96, 61 Fed.Reg. 45985 (Aug. 30, 1996).)

was done by promulgating emergency regulations[4] under section 11346.1(b)
—the same procedure inaugurating the state's prenatal care program for
illegal aliens in 1988—in order to bring the state regulations promptly into
compliance with the requirements of the new law. Appellants authorized the
promulgation of these emergency regulations, which track the requirements
of federal law, and which would be effective for an interim period of 120
days, until final regulations could be prepared, submitted to the public for
comment, and approved. The emergency regulations make the required
written findings of emergency, stating that the PRA "(1) . . . was enacted on
August 22, 1996. Section 411 of this federal law [8 U.S.C. § 1621] took
effect immediately and requires the immediate termination of state or local
government funded public benefits for aliens who are not qualified [i.e.,
legal] aliens . . . . [¶] (2) Congress has determined that there is 'a compel-
ling government interest to remove the incentive for illegal immigration
provided by the availability of public benefits.' [Citation.] California must
abide by that congressional determination in implementing the termination
of benefits as required by federal law, effective immediately."

The validity of the emergency regulations was first challenged in a lawsuit
pending before a federal judge sitting in the Central District of California,
the Honorable Mariana R. Pfaelzer, in November of 1996. Judge Pfaelzer
refused to enjoin the emergency regulations and refused to find appellants in
contempt for attempting to promulgate them. She held that the new regula-
tions were not in violation of her prior order enjoining appellants from
enforcing the terms of California's recently enacted Proposition 187,[5] and
that appellants could not be enjoined from enforcing the provisions of
federal law. As she also observed, the basis for her prior ruling holding
Proposition 187 unconstitutional was that the state proposition had created a
conflict with the then existing federal law and Congress's plenary power
over immigration matters. Therefore, the federal judge concluded it would
make no sense to rule that appellants violated her injunctive order by
attempting to implement the new federal law, the PRA, which is now
consistent with the provisions of Proposition 187. In the words of the federal
judge: "The Court's injunction [re enforcement of Proposition 187] does not
prohibit the implementation of any federal law. Indeed, it is precisely
because the federal government 'possesses the exclusive power to regulate
immigration' that the Court issued its injunction originally. [Citation.]
Therefore, the implementation of the PRA by the State Defendants is beyond

---

[4]In pertinent part, the emergency regulations provided that illegal aliens "are not eligible to
receive the state-only funded nonemergency pregnancy-related services" in issue here. (Cal.
Code Regs., tit. 22, § 50302.1, subd. (a).)

[5]The provisions of Proposition 187, as pertinent here, forbade the state from providing
state-paid health services to illegal aliens. As a result of legal challenges, those provisions did
not go into effect immediately.

the scope of the present injunction." The federal judge also denied relief by observing, "Congress has decided that the states should deny health benefits to illegal aliens. The President has signed the PRA into law. Plaintiffs have not asked the Court to decide any issue under the PRA but only whether the State Defendants can effectuate the PRA under the California Constitution and the California Welfare and Institutions Code. That is a task involving issues far outside the scope of this case which involves only Proposition 187. Therefore, there is no legal basis for a restraining order against the State Defendants. Accordingly, the Ex Parte Application must be denied."

Rebuffed by the adverse result of this decision of a federal district court, the respondent groups objecting to state implementation of the PRA by emergency regulations filed the present lawsuit in the San Francisco Superior Court. There respondents sought a temporary restraining order, and a preliminary injunction, against the same emergency state regulations seeking to implement the new federal law provisions of the PRA.

The trial court initially denied respondents' application for a temporary restraining order, finding it "premature." Later, however, the trial court granted respondents their requested preliminary injunction, barring California's implementation of the PRA through emergency regulations, because the trial court concluded, as a matter of law, that the state's required compliance with that new federal law did not justify the issuance of emergency regulations. The court ruled that the DHS's November 1, 1996, "Finding of Emergency," based on the federal government's passage and enactment of the PRA, was "unsupported by substantial evidence" and must be enjoined.

Appellants Wilson and Belshé filed a timely appeal from this ruling granting a preliminary injunction, which is made appealable by the provisions of Code of Civil Procedure section 904.1.

II. DISCUSSION

We conclude we must vacate the preliminary injunction and remand with directions to deny the request therefor.

A. *Scope of Review, Jurisdiction, and Related Matters*

It is well established that we may only review the trial court's order granting a preliminary injunction for an abuse of discretion. (*Butt* v. *State of California* (1992) 4 Cal.4th 668, 678 [15 Cal.Rptr.2d 480, 842 P.2d 1240]; accord, *Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 447

[261 Cal.Rptr. 574, 777 P.2d 610] (*Common Cause*).) The trial court abuses its discretion in granting such a preliminary injunction when "there is no likelihood" that the movants will prevail on the merits of their claims for relief. (*Ibid.*) "A preliminary injunction may not issue without some showing of potential entitlement to such relief." (*Ibid.*) As we discuss at length below, we find the trial court abused its discretion under this standard.

■ Respondents, who received their requested preliminary injunction below, have also now twice suggested without success that this appeal might be dismissed as moot, and should not now be decided by us on the merits. This is a surprising contention. Respondents contended in the trial court that they would suffer irreparable harm if no such injunctive relief were granted. If this matter were truly moot, then the preliminary injunction should be vacated and the underlying lawsuit should be dismissed on that ground alone.[6]

We do not find the matter before us to be moot. The basis for respondents' mootness argument is their observation that, after the trial court enjoined appellants from enforcing the emergency regulations, appellants, in compliance with the trial court's order, began the lengthy process of preparing nonemergency regulations, making them available for public comment, holding hearings on them, and so on. Respondents suggest that the question of the validity of the emergency regulations is now moot, because the state is in the process of promulgating replacement regulations on a nonemergency basis.

However, it is also well established that the validity of emergency regulations is a matter of public importance, even though in some instances they evade normal appellate review by reason of their replacement by permanent regulations; and that judicial review of such regulations should not always be barred on mootness grounds because such replacement possibilities exist. (*California Medical Assn.* v. *Brian* (1973) 30 Cal.App.3d 637, 650 [106 Cal.Rptr. 555].)

In addition, we do not know whether the latest, nonemergency regulations will go into effect without also being challenged. It seems likely, given the

---

[6]In addition, it appears there was a problem in the trial court concerning respondents' standing to seek injunctive relief. The lead named plaintiff "Carmen Doe" who submitted lachrymose evidence in the trial court concerning her need for prenatal care, also turned out not to be an illegal alien at all. As a legal resident alien, she was not affected by the PRA or the emergency regulations in issue here. Similar problems affected the standing of many of the other named plaintiffs. Respondent City and County of San Francisco, for instance, is neither pregnant, nor illegal, nor an alien. Nevertheless, we discern in the record sufficient evidence that other named plaintiffs have standing to bring this lawsuit; and we note that appellants, who raised this issue in the trial court, do not raise the standing issue again on appeal as a basis for vacating the trial court's order.

previous history of this litigation, that they may not. If we were to vacate the preliminary injunction as moot, nothing would prevent appellants from promulgating the emergency regulations again, to take effect immediately during the proceedings necessary for the promulgation of final regulations; and nothing would prevent respondents from again seeking to enjoin the emergency regulations, and we could simply have a new appeal before us based upon the same grounds as this one. We wish to avoid the possibility of such useless repetition of litigation and its concomitant waste of judicial resources.

More generally, this will surely not be the last time that a federal or state law changes, rendering previous state regulations illegal. The question of whether the state may promulgate interim replacement regulations on an emergency basis is obviously a matter of considerable public interest and importance, which is relatively certain to recur. We, therefore, will proceed to the merits.

### B. *A State Agency May Properly Promulgate Emergency Regulations in Order to Avoid Violating the Provisions of Governing Federal Law*

Appellants acted properly, and well within the discretion conferred upon them by law, in promulgating emergency administrative regulations to conform state regulations to governing federal law and to end the state's violation of federal law by continued expenditure of public funds for federally proscribed purposes. The trial court erred by issuing an injunction effectively requiring appellants to continue such expenditures.

California's Administrative Procedure Act (APA) as codified in Government Code section 11340 et seq., vests a state agency with discretion to issue emergency regulations, which will become effective on an interim basis and for a period of up to 120 days, in order to deal with an "emergency" which calls for prompt action during the period necessary for the promulgation of final regulations. (§ 11346.1(b) & subd. (e).)

Section 11346.1(b) allows a state agency to promulgate emergency regulations as follows: "[I]f a state agency makes a finding that the adoption of a regulation or order of repeal is necessary for the immediate preservation of the public peace, health and safety or general welfare, the regulation or order of repeal may be adopted as an emergency regulation or order of repeal."

In the leading case concerning the validity of such emergency regulations under the APA, *Schenley Affiliated Brands Corp.* v. *Kirby* (1971) 21 Cal.App.3d 177, 194-195 [98 Cal.Rptr. 609] (*Schenley*), the court supported

the issuance of the emergency regulations and held: "What constitutes an emergency is primarily a matter for the agency's discretion." Under *Schenley*, a court is not necessarily bound by an agency's determination of the existence of an emergency, but the court must accord *substantial deference* to this agency finding, and may only overturn such an emergency finding if it constitutes an abuse of discretion by the agency. (*Ibid.*)

In *Schenley*, the court held the agency did not abuse its discretion in promulgating emergency regulations, because other new and rather unclear regulations were about to go into effect, and the agency did not have time to promulgate by nonemergency methods the additional regulations which were needed in order to achieve a fully operational regulatory scheme. Therefore, the pendency of a change in the legal environment, and the lack of time to promulgate regulations in the normal way, may justify the agency in proceeding by emergency regulations. (21 Cal.App.3d at p. 195.)

As Division Four of this district more recently observed, in reversing an order of a trial court which had overturned the issuance of certain emergency ordinances, the term "emergency" has been given a practical, commonsense meaning in the California case law: "[E]mergency has long been accepted in California as an unforeseen situation calling for immediate action. [Citations.] This is 'the meaning of the word that obtains in the mind of the lawyer as well as in the mind of the layman.' " (*Sonoma County Organization etc. Employees* v. *County of Sonoma* (1991) 1 Cal.App.4th 267, 276-277 [1 Cal.Rptr.2d 850] (*Sonoma County*), quoting from *San Christina etc. Co.* v. *San Francisco* (1914) 167 Cal. 762, 773 [141 P. 384].)

 We conclude appellants properly exercised the discretion confided in them by law under *Schenley* when they determined the passage by Congress and signing by the President of a new law, the PRA, which made California's ongoing program of paying for routine prenatal care for illegal aliens illegal under federal law, was "an unforeseen situation calling for immediate action." (*Sonoma County, supra,* 1 Cal.App.4th at p. 276.)

Under the PRA, California was in violation of the provisions of a valid federal law which Congress had passed in the exercise of its plenary power over immigration matters. The PRA had become effective immediately, because of Congress's judgment that the provision of public benefits to illegal aliens was a violation of federal immigration policy which should be ended immediately. Appellants would have been subject to justified criticism if they had simply ignored the provisions of the federal law, as respondents might have wished. Under the principles stated in *Schenley* and *Sonoma County*, when appellants decided to issue emergency regulations in this case,

to take effect temporarily and on an interim basis during the lengthy proceedings necessary for the preparation of final regulations, appellants "did not abuse [their] discretion." (*Schenley, supra,* 21 Cal.App.3d at p. 195.)

In addition to these California authorities, numerous authorities from the federal courts and other state courts also hold that the promulgation of interim or emergency regulations is proper in such circumstances. For instance, in *Philadelphia Citizens in Action* v. *Schweiker* (3d Cir. 1982) 669 F.2d 877, 885-888 (*Schweiker*), the Third Circuit upheld the issuance of similar emergency regulations by the federal government in order to reduce eligibility for public benefits in accord with the requirements of a new federal law. The new federal law had required states to comply within a period of 49 days, which was too short a period of time for the lengthy process of promulgation of administrative regulation on a nonemergency basis; and therefore, the agency did not abuse its discretion in promulgating emergency regulations. A fortiori, where as here Congress demanded *immediate* action by the states to bring their programs into compliance with the federal law, appellants did not abuse their discretion in attempting to comply as quickly as possible. (*Id.* at pp. 885-888.)[7]

Similarly, in *Dickenson* v. *Petit* (1st Cir. 1982) 692 F.2d 177, 180-181, then Circuit Judge Breyer of the First Circuit held, while citing *Schweiker,* that the lower court properly refused to impose a preliminary injunction which would have barred a state from immediately complying with a new federal law, which imposed a cutback in welfare benefits. (See also *American Transfer & Storage Co.* v. *I.C.C.* (5th Cir. 1983) 719 F.2d 1283, 1294-1295 [The issuance of interim rules was proper because the governing law had changed, effective immediately. (Citing *Schweiker.*)].)

Subsequently, in an analogous Connecticut case, the state court followed *Schweiker* and upheld the issuance of emergency state regulations in order to conform state law immediately to a change in federal law restricting certain welfare benefits. (*Melton* v. *Rowe* (1992) 42 Conn.Supp. 323 [619 A.2d 483, 486] (*Melton*).) The *Melton* court correctly noted a court hearing a challenge to such emergency regulations " 'must not be swayed by our views of the

---

[7]Although Circuit Judge Higginbotham dissented in *Schweiker,* the basis of his dissent was his belief that the period of 49 days granted by Congress was, in fact, sufficient for the promulgation of nonemergency regulations. (*Schweiker, supra,* 669 F.2d at p. 892.) The majority in *Schweiker* held that a change in federal benefits law and the existence of a congressional mandate for compliance would justify the issuance of emergency regulations. Therefore, the trial court's and respondents' attempts to distinguish *Schweiker* are unavailing. Under *Schweiker,* and under all the other cases from other jurisdictions, a change in federal benefits law which Congress desires to go into effect by a particular date provides a justification for the issuance of emergency regulations to effectuate the will of Congress.

desirability of the underlying statutory policy that [an agency] is bound to implement.' " (P. 489, quoting from *Schweiker, supra,* 669 F.2d at p. 888, bracketed language ours.)

Under this principle, the trial court in assessing the validity of the DHS's invocation of the emergency rulemaking procedure should adopt an attitude of *neutrality* toward the subject matter of the underlying regulations. The trial court accepted respondents' views of sound policy to the exclusion of the policy which Congress and the DHS competently sought to implement. This case was not one where, under neutral principles, no unforeseen situation calling for immediate state action existed; or where the DHS was not bound to implement a new, binding, and immediately effective law. The DHS in 1988 properly used emergency regulations to provide health benefits promptly to illegal aliens in response to an unforeseen change in the then governing law. (Stats. 1988, ch. 1441, § 1, subd. (g), p. 4918.) Under the neutrality principle, the DHS did not abuse its discretion by also using emergency regulations here to respond to another more sweeping and previously unforeseen change in controlling federal law, which Congress indicated should go into effect immediately. (See *Schweiker, supra,* 669 F.2d at p. 888; cf. also *Schenley, supra,* 21 Cal.App.3d at pp. 194-195.)

The trial court recognized but failed to properly apply this neutrality principle and, in so doing, ignored a salient legal point: Once Congress, with plenary immigration powers, has emphatically decided California may not provide public funding for routine prenatal medical services for illegal aliens, neither we nor the trial court may undermine the congressional mandate by reasoning, as the trial court appears to have done here, that the PRA ignored advisable medical practices, or that the PRA gave no express "deadline for compliance" (apparently disregarding the *immediate* effect of the PRA), and that its "mere enactment" created no "emergency" triggering the state's authority and duty to comply with the immediately effective federal mandate through its powers under section 11346.1(b).

The trial court, thus, rejected Congress's mandate (and the state's attempted compliance therewith) that the PRA, passed in the exercise of federal plenary jurisdiction over immigration matters, become immediately effective on passage. Instead, it found the state should postpone implementation of the federal law until some future time, when all other state administrative procedures would be completed and permanent implementing regulations formally adopted.

The effect of the trial court's ruling was to require continued expenditure of state public funds for purposes Congress forbade, and to ignore the

precedent condition Congress laid down for allowing such expenditures of public funds after the PRA's effective date: the passage of new state legislation after August 22, 1996, which would authorize them.

In sum, the trial court rationalized its decision on erroneous bases, none of which can thwart the intention of Congress in enacting laws over which it has plenary jurisdiction or the state's efforts to promptly comply with its clear requirements.

First, the trial court relied on inapposite authority to support its postulate that if Congress had given some express *postpassage deadline* for state compliance with the PRA, interim state regulations terminating public funding of routine prenatal care for illegal aliens by that date would be upheld. But, the court erroneously reasoned, that because Congress made the PRA *immediately* effective on passage, such interim regulations must remain inoperative and ineffective pending the adoption of permanent regulations concerning that subject at some later time, after notice, comment, and their final adoption.

Second, the trial court received evidence that the provision of routine prenatal care for pregnant women is a medically advisable practice. That, of course, is a matter of such modern common knowledge and general acceptance, neither the trial court nor we may presume it to have escaped the ken of Congress in nonetheless enacting the PRA, pursuant to national immigration policy of removing incentives for illegal immigration. The expenditure of public funds for such routine prenatal care furnishes an additional inducement to illegal immigration by pregnant women. Congress proscribed such public expenditures despite the objective benefit a pregnant illegal alien would receive therefrom.

The trial court erred in apparently elevating this evidence and similar medical evidence to a superior position in the analysis leading to its conclusion that the state's interim regulations being enjoined were unnecessary to respond to an emergency.

This error was compounded when the trial court took evidence on which appellants' emergency findings were neither considered nor premised, and concluded therefrom that such emergency findings were "unsupported by substantial evidence," and that it was thus empowered to review those findings "to see whether DHS has a substantial basis" therefor. The trial court cited state court decisions from other jurisdictions in support of this position—*Melton, supra*, 619 A.2d 483 and *Am. Grain Prod. Proc.* v. *Dept. of Pub. Hlth.* (1984) 392 Mass. 309 [467 N.E.2d 455]. These cases do not support the trial court's ruling.

Appellants' findings of emergency were not premised on conflicting evidence, e.g., as to the medical advisability of continued publicly funded routine prenatal services for illegal aliens. They were based on three undisputed matters of law and facts: that section 411 of the PRA (8 U.S.C. § 1621) became effective immediately on passage in August 1996; that it required termination of state funded public benefits for routine prenatal care for illegal aliens; and that Congress, exercising its plenary jurisdiction over national immigration policy in enacting this legislation, determined it furthered a compelling public interest by removing the incentive for pregnant illegal aliens to enter this country to receive such benefits.

Based on these undisputed matters, appellants found an emergency existed by reason of the PRA's enactment, requiring immediate conformity with the federal mandate which, of course, terminated the continued expenditure of state funds for purposes that Congress proscribed.

These findings were required to be reviewed on an abuse of discretion standard. (*Schenley, supra,* 21 Cal.App.3d at pp. 194-195; cf. *Poschman* v. *Dumke* (1973) 31 Cal.App.3d 932, 941 [107 Cal.Rptr. 596] (*Poschman*).) That standard of review could not be converted to one of review for substantial evidence by the trial court's *post hoc* consideration of other alleged medical evidence appellants did not consider in enacting the emergency regulations at issue.

The DHS's conclusion that its regulations were necessary to respond to an emergency was patently within its statutory discretion, and was proper but ignored. That conclusion was that an emergency, i.e., "an unforeseen situation calling for immediate action" (*Sonoma County, supra,* 1 Cal.App.4th at p. 276), was presented when the PRA immediately proscribed the use of public funds by the state to provide such medical services to illegal aliens. Under these circumstances, the public welfare clearly required the immediate termination by interim regulations of such expenditures to stop the continued draining of the public fisc for purposes emphatically forbidden by Congress.

The trial court cited a large number of other cases in support of its erroneous conclusion. The cases cited, however, simply do not support the trial court's ruling.

In both *Schweiker* and *Melton*, which the trial court cited extensively, the courts actually *upheld* the issuance of interim, emergency regulations in similar circumstances where the governing law had changed. (Such emergency regulations were also upheld in *Schenley, supra,* 21 Cal.App.3d at p.

195, the leading California case, which the trial court unaccountably failed to cite.) In *Sonoma County*, which the trial court also cited, this district overturned a trial court which had invalidated emergency ordinances.

The trial court also cited, but failed to properly apply, the language from *Poschman*, which restated the *Schenley* standard of review as follows: "Courts are not conclusively bound by an agency's determination that an emergency exists, *although it is recognized that what constitutes an emergency is primarily a matter for the agency's discretion.*" (*Poschman, supra,* 31 Cal.App.3d at p. 941, italics added.)[8] Proper application of this principle would have led the trial court to conclude there was no abuse of discretion here.

The trial court likewise cited *State of N. J. v. U. S. Environmental Protection* (D.C. Cir. 1980) 626 F.2d 1038, 1042 [200 App.D.C. 174], which held that the federal Environmental Protection Agency could not issue final regulations on an emergency basis when it had ample time to comply with the federal version of the APA by issuing them on a regular basis before the congressional deadline passed. In the case at bench, the state did not have time to use the regular procedure, since the federal legislation was effective immediately.

Under the principles stated in these cases, appellants did not abuse their discretion, because they lacked the time to promulgate regular regulations before the governing law went into effect. The trial court erred in ruling to the contrary.

No case from any American jurisdiction cited by the trial court or respondents, or discovered by our own independent research, holds that an administrative agency abuses its discretion under the APA standards by issuing emergency regulations when: (1) such action is necessary to promptly comply with a federal or state law; (2) the governing law is becoming effective before the agency would have time to promulgate regulations in the regular, nonemergency manner; and (3) the governing body,

---

[8]The *Poschman* court also observed that there was no "crisis situation" which would justify using emergency regulations to retroactively revoke a grievance procedure which had already been invoked and partially exhausted by the grievant, a college professor who had been recommended for, but denied, tenure under the emergency regulations. (31 Cal.App.3d at p. 942.) We agree with the *Poschman* court, but we observe that the result might well have been different if the governing law had been changed, and if the case had had no aspect of forbidden retroactivity. The term "emergency" under California law is not necessarily limited to a "crisis situation" and encompasses "an unforeseen situation calling for immediate action." (*Sonoma County, supra,* 1 Cal.App.4th at p. 276.) There is nothing in *Poschman* which holds that a change in the governing law, which Congress intends should become effective immediately, would not suffice.

here Congress, clearly has indicated it requires compliance with the new law by the most expeditious means.[9] We believe there are good reasons why no such case seems to exist. Where, as here, Congress has commanded the states, in the exercise of Congress's plenary power over immigration matters, to comply immediately with a federal law, it would be absurd to hold that the states have abused their discretion by obeying Congress and complying as promptly as possible.

For these reasons, we must also reject respondents' suggestions that principles of constitutional due process would be violated if the state complied with federal law. "It would make no sense to say that Congress has plenary power in the area of immigration and naturalization and then hold that the Constitution impels the states to refrain from adhering to the federal guidelines." (*Sudomir* v. *McMahon* (9th Cir. 1985) 767 F.2d 1456, 1466; accord, *Khasminskaya* v. *Lum* (1996) 47 Cal.App.4th 537, 545 [54 Cal.Rptr.2d 915].)[10]

Respondents also suggested, and the trial court likewise opined, that the DHS's action here was invalid because it violated the public interest embodied by the APA's provisions in allowing a notice and comment period to persons who would be affected by the new regulations. (See *Voss* v. *Superior Court* (1996) 46 Cal.App.4th 900, 908-909 [54 Cal.Rptr.2d 225] [The court concluded, however, that this APA interest did not apply in the particular case before it.].) We agree this is usually an important interest under the APA; but it is an interest which an agency may override, in its discretion, when it properly concludes an emergency exists. (*Schenley, supra*, 21 Cal.App.3d at p. 195.)

More critically, in the present case the normal interest in having an extensive notice and comment period simply did not apply. This is not a case in which an agency, acting on its own, has suddenly and without notice

---

[9]Of course, not every change in federal law (or state law) will necessarily justify the promulgation of emergency regulations in an effort to achieve regulatory compliance. Sometimes Congress or the Legislature will not direct that compliance begin immediately. Sometimes an administrative agency may conclude, unlike here, that the complexity of the regulations to be promulgated will counsel against using the emergency procedure, even where the law has been changed. Sometimes an administrative agency, in the exercise of its discretion, will properly decide that the need for comments from the public concerning the manner of compliance will be determinative, in the absence of any indication from the governing law that regulatory compliance should take place as soon as possible. We simply find no abuse of the DHS's discretion here. (See *Schenley, supra*, 21 Cal.App.3d at pp. 194-195.)

[10]In addition, the emergency regulations also afford due process to affected persons by according extensive administrative procedures and remedies, designed to avoid an erroneous action in any particular case.

formulated a new rule of law. The rule of law which the DHS sought to enforce was the one previously stated by Congress in the PRA (the substance of that statement also appeared in Proposition 187). The DHS could not vary that rule of law and was bound to follow it. The passage of the PRA provided ample notice to affected parties that the federal law was being changed, effective immediately; and no amount of comment from the public during the DHS proceedings could change the PRA's provisions.

We recognize that Judge Pfaelzer's initial ruling as to the asserted conflict between Proposition 187 and federal law had stayed the implementation of Proposition 187. As she later correctly ruled, however, the enactment of the PRA removed the obstacle to these regulations, which are coincidentally consistent with Proposition 187.

Consequently, the DHS here lacked discretion as to whether to continue to provide taxpayer funding for these benefits, under either state or federal law; and further notice or comment would be an exercise in futility as far as changing the PRA. Solicitation or receipt of comments adverse to the change would, at most, be simply a delaying tactic with no prospect of ultimate success. Therefore, the normal public interest in an extensive notice and comment period did not obtain in this case, further confirming the DHS's lack of abuse of discretion in promulgating the regulations on an emergency basis. (See *Schenley, supra,* 21 Cal.App.3d at pp. 194-195.)[11]

Respondents also sought the trial court's ruling invalidating the emergency regulations on the ground the regulations would allegedly cause "confusion" among physicians, who would have to differentiate between routine care for illegal aliens, which may no longer legally be provided with taxpayer funds, and emergency care which remains authorized for humanitarian reasons. However, this sort of "confusion" would result from any change in the law, and especially from the choice Congress made in continuing to allow emergency services. This is not the sort of confusion resulting from a choice made by the DHS which would justify invalidating its regulations as an abuse of discretion, merely because the regulations are in accord with governing law. (See *Schenley, supra,* 21 Cal.App.3d at p. 195.) In addition, if there is "confusion" among the members of the medical profession as to the difference between an emergency condition and routine medical care, then a delay in making the DHS's regulations effective will

---

[11]We do not hold that the PRA *preempted* the California APA. Instead, we only hold that the passage of the PRA justified the state, in its discretion, in employing the emergency procedure allowed by the California APA. However, we also note that the federal law here became effective immediately and, under the supremacy clause, preempted state laws to the contrary, including any of California's existing laws and regulations which had provided funds for routine medical care for illegal aliens.

not aid in dispelling that confusion. And if there is a problem in what Congress has done, only Congress and not a state agency or a trial court, can correct the problem now. (See *Schweiker, supra,* 669 F.2d at p. 888; cf. also *Schenley, supra,* 21 Cal.App.3d at p. 195.)

Strangely, respondents also contend appellants could not proceed by emergency regulations, because appellants allegedly did not do so quickly enough. Respondents fault appellants for not taking such action until November, although the President had signed the PRA in August. This argument ignores the fact that appellants' action was blocked by litigation concerning the implementation of Proposition 187 in federal court until November, when Judge Pfaelzer rejected the contention that appellants would be in contempt for violating her injunctive order if they tried to comply with the law as Congress intended. Only when the federal judge cleared this legal lumber out of the road could appellants' emergency vehicle proceed. The state trial court here also properly rejected respondents' argument on this point, observing that appellants were "acting with all deliberate speed now, and that's what Congress would expect." We agree with the trial court on this issue.

The states may not be compelled by a court to continue to violate a valid federal law with which they are only trying to comply as quickly as possible, in obedience to the will of Congress.

We hold the trial court's injunctive order was an abuse of discretion. Under no reasonably possible likelihood were respondents legally entitled to the relief requested. The order granting the preliminary injunction must, therefore, be vacated. (See *Common Cause, supra,* 49 Cal.3d at p. 447.)

III. DISPOSITION

The order granting the preliminary injunction is vacated. The matter is remanded to the trial court with instructions to enter a new order denying the request for a preliminary injunction.

Haning, J., and Jones, J., concurred.

The petition of respondents Carmen Doe et al. for review by the Supreme Court was denied November 12, 1997.